580 A.2d 262
IN THE MATTER OF GEORGE SPINA, AN
ATTORNEY AT LAW.

Argued September 26, 1989—Decided September 21, 1990.

*Richard J. Engelhardt,* Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Stephen R. Knox* argued the cause for respondent.

PER CURIAM.

Respondent, George C. Spina, pleaded guilty in 1984 to one count of a two-count information filed by the U.S. Attorney's office in Washington, D.C. The second count, the subject of the plea, charged respondent with taking property without right (a lesser-included offense of petty larceny commonly referred to as "unauthorized borrowing"), in violation of *D.C. Code* § 22–1211. The offense is equivalent to a disorderly-persons offense under New Jersey law. The Office of Attorney Ethics (OAE) moved before the Disciplinary Review Board (DRB) for final discipline based on a criminal conviction. See *Rule* 1:20–6(b)(2)(i). After a hearing, a five-member majority of the DRB recommended disbarment, with four members voting for a three-year suspension.

After completion of proceedings in this Court, we remanded to the DRB to prepare Supplemental Findings of Fact and Conclusions, affording both the OAE and respondent the opportunity to comment on those findings. Thereafter the DRB submitted its supplemental report, and again five members voted to disbar and four to suspend for three years. Our independent review of the entire record leads us to accept the recommendation of the majority of the DRB, calling for disbarment.

I

Shortly after being admitted to the New Jersey bar in 1977, respondent began his association with the International Law Institute (ILI), which was then an independently-chartered entity of Georgetown University, made part of the Georgetown University Law Center for administrative convenience. The Law Center handled routine administrative matters for the ILI but did not exercise overall direction or policy control over its activities. The ILI became a separate entity on July 1, 1983,

and is no longer controlled by the University. Although Spina was admitted to practice in the District of Columbia in 1979, he has never practiced law either in New Jersey or in the District.

At various times respondent held the positions of Director of Research, Director of Administration, Executive Director, and Acting Director of the ILI. His responsibilities required him to function as teacher, administrator, and fund-raiser. He was frequently called on to travel throughout the United States and abroad to conduct ILI-sponsored conferences and programs, in addition to which he spent considerable time, effort, and money entertaining important members of the international legal community. He devoted himself almost completely to the affairs of the ILI, so that, according to his attorney, "it virtually became his whole life."

Respondent's efforts were successful in that under his direction the ILI flourished and prospered, but those efforts were not without cost. Respondent's salary started at $16,000 and never exceeded $30,000 a year, an amount insufficient to fund the various activities that Spina thought necessary to advance the interests of ILI. He therefore began to spend significant amounts of his own money on ILI-related matters, but quickly became impatient with the inefficiency of the University's cumbersome reimbursement process. As a result Spina began to intermingle ILI money with his own by frequently depositing ILI funds in his personal account, taking the position that he was spending ILI funds on ILI business. The liberties he took with ILI's money, however, exceeded any recognized bounds of propriety.

For example, on March 6, 1979, August 7, 1979, and February 12, 1980, Spina deposited in his personal checking account three checks representing contributions to ILI, totalling about $17,-000. Also during 1980 he submitted reimbursement claims for about $1600 for three first-class tickets covering air travel for business trips, when in fact Georgetown University Law Center had originally purchased those tickets. Respondent's unortho-

dox and improper accounting procedures came to the attention of Georgetown University officials when, in 1981, the Bechtel Corporation inquired about a $15,000 contribution it had made to ILI by check in December 1980—a check that Spina had deposited in his personal checking account on December 20. Unable to locate the money, University officials opened an investigation. Respondent, apparently unaware of the probe, continued his errant behavior by depositing into his personal account, in April 1981, traveler's checks and currency received by the Law Center as tuition payments. Finally the assistant dean of the Law Center confronted Spina in May 1981 with the Bechtel-check problem. Instead of acknowledging the error of his ways, respondent invented a series of wholly-implausible explanations about the missing check.

Remarkably, respondent's awareness of the investigation produced no change in his handling of other people's money: he continued to deposit ILI funds in his personal account, including checks and currency received by the Law Center as tuition payments. Equally remarkably, in September 1981 he sought reimbursement of about $400, the cost of a limousine service, which he told the Law Center had been for a business trip with Senator Charles Matthias of Maryland and the Attorney General of Australia. In fact, it had been for respondent's personal use to attend a wedding.

The Bechtel Corporation's missing check continued to baffle the Law Center investigators. In addition to constructing five different versions of what had happened to those funds, respondent attempted to alter a copy of the check and submitted forged invoices. In November 1981, however, Spina finally acknowledged that he had converted the Bechtel check to his own use. When pressed about conversions of other ILI funds, however, he insisted that there had been no other instances of conversion. Respondent was dismissed from his position with ILI in November 1981. Ten days thereafter he made restitution of the $15,000 plus interest.

Thereafter the United States Attorney for the District of Columbia continued the investigation, culminating in the issuance in June 1984 of the two-count information. By that time respondent had made full restitution of all amounts ultimately found due the University. Although the record is not entirely clear on the precise amounts in question, we accept respondent's summary, as follows:

| | | |
|---|---:|---:|
| Total original amount claimed to be mishandled under [U.S. Attorney's] investigation | | $46,499.66 |
| Amount restored by Spina before commencement of the investigation | ($19,900.00) | |
| Adjusted total amount remaining during investigation | | 26,599.66 |
| Total offset of business-related expenditures, as allowed by ILI Trustees | 18,368.85 | |
| Less amounts not reimbursable under GULC policy | 4,067.94 | |
| Less miscellaneous bookkeeping adjustments | 641.87 | |
| Net offset credit allowed under GULC policy | | $13,659.04 |
| Amount repaid by Spina | | $12,940.62 |

On June 24, 1984, Spina pleaded guilty to the misdemeanor of taking property, the Bechtel $15,000 check, without right. As part of the plea agreement Spina admitted converting an additional $32,000. The transcript of the proceedings reads:

THE COURT: As part of the plea agreement, you also have agreed to admit to converting amounts listed in Count One, paragraphs 9 through 12 [of the information].

Paragraph 9 of Count One alleges that you took or converted funds and checks totalling $32,000 as follows:

On March 6th, 1979, $2,000; August 7, 1979, $5,000; February 12th, 1980, $10,000; December 20, 1980, $15,000; that you used for your own personal purposes.

> That Count Ten indicates that you converted on April 1, 1981 and June 17, 1981 in the form of traveler's checks and currency of $11,500; that further that during 1980 that you requested reimbursement and received a reimbursement for an airline ticket having the total value of $1592.26.
>
> And finally, in paragraph 12, September 14th or thereabouts, 1981, you submitted a claim for a reimbursement for limousine services of $407.40 knowing the limousine services were for your personal use.
>
> As part of the plea agreement the Government indicated you would admit to converting those amounts on or about the date set forth in paragraphs 9 through 12 that I've just reviewed.
>
> Did you so convert those funds as alleged in paragraphs 9 through 12—
> DEFENDANT SPINA: Yes, I did.

When asked to tell the court in his own words what he had done, respondent said:

> During the course of my employment with the University and the Institute, various times I converted—I commingled their moneys and my own. When I first went to work I was spending some of my own money on them and towards the end of my employment I was spending some of their money on me.
>
>     *      *      *      *      *      *      *      *
>
> While I knew what I was doing and I knew it was wrong, and I know it's wrong now and I regret it, I've never denied doing it. It was stupid and foolish but nevertheless.

In August 1984 the court sentenced respondent to six-months confinement and fined him $100, the maximum permitted under the law. The court had no doubt that "[Spina] did convert the money without right, that that very likely constitutes an offense for which disbarment could be ordered * * *." It then suspended execution of the custodial term and put respondent on probation for three years with several special conditions, all of which he has satisfactorily fulfilled.

In August 1985 the District of Columbia ethics authorities suspended respondent from the practice of law for medical reasons. The District has not addressed the merits of the ethics matter. The OAE commenced these proceedings in July 1986.

The DRB concluded that "[r]espondent's conviction establishes that he engaged in dishonesty, fraud, deceit and misrepresentation that adversely reflects on his fitness to practice law, in violation of *DR* 1–102(A)(3)(4)." Turning to the appropriate

discipline, the DRB observed that the fact that respondent's misconduct did not arise from a lawyer-client relationship or that respondent did not commit his offense in a professional capacity is immaterial, although the absence of a lawyer-client relationship rendered respondent's misuse of ILI's funds not technically a violation of *DR* 9–102, which would automatically mandate disbarment, citing *In re Suchanoff*, 93 *N.J.* 226, 460 *A.*2d 642 (1983). Addressing the mitigating factors, including respondent's remorse, his contention that everything he did was intended to benefit and to enhance the prestige of ILI, and his apparently otherwise unblemished career, the DRB found them insufficient to overcome the force of his "purloin[ing]" of the Bechtel check and his "admissions to many more instances of conversions * * *." The Board, characterizing respondent as "a calculating thief," said:

> Respondent's avarice overwhelmed him. Unlike the attorney's actions in [*In re Rutledge*, 101 *N.J.* 493, 502 *A.*2d 569 (1986)], where he diverted travel agency commissions to his own personal use, and the lawyer's actions in *In re Franklin*, [71 *N.J.* 425, 365 *A.*2d 1361 (1976)], where his business expenses were exaggerated, respondent engaged in a systematic and continuous misuse of his employer's money to sustain an outward lifestyle that can only be characterized as opulent. In so doing, respondent forged endorsements on checks, stole currency and submitted fraudulent expense vouchers. Respondent's assertions that he believed the money to be his for use for ILI business is simply not credible.

The DRB rejected as well respondent's argument that his psychological problems excused his misconduct. It underscored respondent's awareness of the wrongfulness of his conduct, surely by May 1981 when the Law Center's assistant dean first questioned respondent. The DRB concluded that Spina's fabrication of five different explanations for the check's disappearance demonstrated his moral awareness of misconduct, despite which he continued to divert money to his own account.

Believing that there is a need to guarantee to the public that one who cannot conform to the standards of the profession will never again be licensed, a majority of the DRB concluded that "respondent's misconduct 'constitutes irrefutable evidence of a profound lack of professional good character and fitness' "

(quoting *In re Templeton,* 99 *N.J.* 365, 367, 492 *A.*2d 1001 (1985)). Dissenting from the five-member majority's recommendation for disbarment, four members of the DRB, feeling "bound by respondent's plea to a crime [that] would constitute a disorderly persons offense in New Jersey," and believing that the facts underlying the conviction for conversion of the $15,000 Bechtel check would not justify disbarment, recommended a three-year suspension.

After hearing argument, this Court remanded to the DRB for a statement of any facts, in addition to the conviction itself, that the DRB concluded were relevant on the question of appropriate discipline, based on the written record, the transcript of the plea proceedings, the plea agreement, and "any documents that the Board finds respondent to have conceded as accurate, including the pre-sentence report and governmental sentencing memorandum * * *."

Thereafter the DRB submitted its supplemental findings of fact and conclusions, studded with references to documents that the sentencing court, without objection from respondent, had made part of the record, namely, the United States government's memorandum in aid of sentencing, respondent's memorandum in aid of sentencing, and the presentence report. Both parties had referred to those documents in their submissions to the DRB and this Court. The DRB's supplemental report makes clear that the DRB extended its review beyond the plea to what would be a disorderly-persons offense in this state, "to consider both the intent and knowledge of the respondent." The DRB again concluded that the respondent had "engaged in a systematic and continuous misuse of his employer's money to sustain an outwardly lavish lifestyle," with a reference to the presentence report's observation that Spina "substantially exceeded his legitimate income," and that "he travelled in an expensive manner, shopped at exclusive stores and demonstrated extravagance in his social undertakings."

In addition, the DRB referred to the government's memorandum in aid of sentencing, which points out that among respondent's expenditures was a $2300 Cartier's wrist watch for himself and $2580 worth of jewelry for his sister. Particularly telling is the government's analysis in that document of each of the conversions to which respondent admitted as part of the plea agreement. It reads:

| | | |
|---|---|---|
| 3/6/79 | $2,000 | Before Spina deposited this check into his account, the account balance was $2,164.01. The money was consumed within three or four weeks by reason of his having paid his Diners, American Express and Carte Blanche bills totalling $2,913.16. In addition, he paid off $1,400 toward the remainder of a loan from his sister. |
| 8/7/79 | $5,000 | Before Spina deposited this amount into his checking account, his balance was $638.06. |
| 2/12/80 | $10,000 | At the time Spina deposited this check into his checking account, its balance was $770.91. Some of his uses for this money was to contribute $100 to Seton Hall University, to repay a loan from his sister in the amount of $4,500, to pay an art gallery $550, to pay Brooks Brothers $418.80 and then in another payment $658.99, and pay $1,579 toward his next season's opera tickets. By May 21, 1980, his checking account balance was down to $210.69. |
| 6/80 12/80 | (airplane-) (ticket ) (scam ) (total- ) (ling ) ($2,592.26) | During this time period, whereas Spina had always been exceedingly prompt in paying all of his credit card bills, he fell more than a month behind in almost all of his credit card payments while he borrowed $2,000 from his mother on July 1, $1,543.05 from his sister on |

September 23, and another $3,000 from his mother on October 6.

12/29/80    $15,000    Before Spina deposited this check into his account, its balance was $414.29. The Bechtel check was written on December 17, 1980, and Spina did not deposit it into his account until December 29, 1980. During that interval, during which Spina was still over a month behind on his credit cards, Spina purchased a Christmas present for himself on December 24, 1980, a $2,300 Cartier wristwatch which he charged on his American Express Card. Some of the uses to which Spina put this $15,000 were payments to the following people or entities: his mother—$50; Diners Club $461.45, American Express—$1,233.01, Carte Blanche—$143, the Air Force Association (Life Membership)—$200, Metropolitan Opera—$375, Columbia University—$1,000, Republican National Committee—$50, Seton Hall University—$100, repayment of a loan to his mother—$5,000, repayment of loans from his sister —$3,448.05, payment to his mother—$500, payment to Brooks Brothers—$498.29, and another payment to the Metropolitan Opera—$345.

On March 4, 1981, Spina received a long overdue expense reimbursement of some $5,300 (which included his airplane ticket overbilling of $1,494) and it was from this money that he paid an American Express bill totalling $4,805.19, including the cost of his watch.

4/1/81    $6,600    Before Spina deposited this check, his checking account balance was

$526.37. ON THE VERY NEXT DAY, APRIL 1, 1981, HE PAID THE METROPOLITAN OPERA $4,144, INCLUDING $3,844 FOR HIS NEXT YEAR'S SEASON TICKETS AND A $300 CONTRI-BUTION. Other uses for this money were payments to Paul Stuart in New York of $129.60 and $105.22 (for leather goods), payments to Diners Club of $532.77, and to American Express of $1,026.84, and payment of his personal federal and local income taxes of $877.18.

6/17/81    $4,900

Before depositing this check into his account, Spina's balance was $143.74. Uses for this money were Paul Stuart—$346.87, Tiffanys—$356.40, Carte Blanche—$234.33, Brooks Brothers—$740.50, American Ballet Theatre —$100, American Express—$983.50, Diners Club—$293.52, Brooks Brothers—$271.36, The Mayflower 50–year Fund—$100, U.S. Historical Society—$199, and a pipe organ service (for his hometown church)—$1,175.

On July 27, 1981, he borrowed $15,000 from his mother. One of the uses of this money was to pay an American Express bill of $3,542.49 which included a $2,580 cost for jewelry which he had given to his sister.

A five-member majority of the DRB again recommended disbarment, with the four-member minority adhering to its previous position that respondent's plea could justify no more than a three-year suspension.

## II

Before this Court respondent argues that the DRB erred in going beyond the four corners of his plea of guilty to a misdemeanor. More particularly, he claims that the statute he admits having violating is a "general intent" statute that requires only a showing of an intention to commit the proscribed act and does not require a showing of a specific intent to steal. Therefore, because respondent has been convicted only of unauthorized borrowing, the DRB's conclusion that he was "a calculating thief" was based on unproven allegations.

Respondent's argument suffers from sterility. When, as here, the proceedings are initiated by a motion for final discipline based on a criminal conviction, the ethics authorities and this Court may be required to review any transcripts of a trial or plea and sentencing proceeding, pre-sentence report, and any other relevant documents in order to obtain the "full picture." This Court has held that it is appropriate to consider "evidence [that] does not dispute the crime but shows mitigating circumstances [relevant to] the issue of whether the nature of the conviction merits discipline and if so, the extent thereof." *In re Mischlich*, 60 *N.J.* 590, 593, 292 *A.*2d 23 (1972). That principle suggests that it is appropriate as well to examine the totality of circumstances, including the details of the offense, the background of respondent, and the pre-sentence report in reaching an appropriate decision that gives due consideration to the interests of the attorney involved and to the protection of the public.

In this case we do no violence to the procedures that govern our disciplinary function nor to notions of due process when we take into consideration respondent's acknowledged misuse of funds, in addition to the Bechtel check, belonging to ILI. Respondent's acknowledgement of his conversion of many other checks and cash beyond the Bechtel $15,000 check was part of his plea agreement, and the various documents that put flesh on the bare bones of respondent's conversions were all made

part of the sentencing court's record and were referred to in these disciplinary proceedings. The sentencing court pointed out that respondent's admitted guilt established that he had engaged in a "pattern of activity" including forging checks, stealing cash, and submitting false reimbursement claims. Respondent does not dispute that he concocted five different stories in order to avoid responsibility for the Bechtel-check conversion, or that he lied about other conversions after finally admitting the Bechtel transgression.

Respondent offers in mitigation the report of a treating psychiatrist, who concluded that respondent suffered from a "Narcissistic personality disorder," which did not prevent him from knowing right from wrong but did lead "to the performance of the alleged acts." In the psychiatrist's view, however, those acts were not based on a specific intent to commit a crime but rather resulted from a "difficulty * * * similar to a person misperceiving or not perceiving an object in front of him because of a blind spot in [the] vision. Thus, it can be seen as a handicap rather than representing a conscious and deliberate act."

The quirk of mind that bedevils respondent, however, did not, by his own admission, prevent him from a full realization that his misuse of ILI's money was wrong. So flagrant were the ethical violations that we would not hesitate to disbar had the misconduct arisen out of a lawyer-client relationship. Nor do we believe that we should hesitate here, where the relationship was fiduciary in nature.

There is no escaping the fact that Spina knowingly misused substantial amounts of his employer's funds over a two-and-one-half-year period, taking quantities of money when his personal checking account ran low, and then lied when confronted by his employer. No discipline short of disbarment can be justified.

Respondent is disbarred. He is to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

For Disbarment—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN–7.

OPPOSED–NONE.

## ORDER

It is ORDERED that GEORGE C. SPINA of MAPLEWOOD, who was admitted to the bar of this State in 1977, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that GEORGE C. SPINA be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that GEORGE C. SPINA comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that GEORGE C. SPINA reimburse the Ethics Financial Committee for appropriate administrative costs.

WITNESS, the Honorable Robert N. Wilentz, Chief Justice, at Trenton, this 21st day of September, 1990.