627 A.2d 156

IN THE MATTER OF STEVEN G. SIEGEL,
AN ATTORNEY–AT–LAW.

Argued May 4, 1993—Decided July 23, 1993.

*John J. Janasie,* First Assistant Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Justin P. Walder* argued the cause for respondent (*Walder, Sondak, Berkeley & Brogan,* attorneys; *Mr. Walder* and *John A. Brogan,* on the brief).

PER CURIAM.

This matter arises from a grievance filed with the District XIV Ethics Committee by the law firm of McCarter & English (M & E) against one of its former partners, respondent, Steven G. Siegel. The complaint charged respondent with three counts of unethical conduct in violation of *Rule of Professional Conduct* 8.4(c), which prohibits "conduct involving dishonesty, fraud, deceit or misrepresentation." The first count charged respondent with fabricating disbursements and misappropriating funds of M & E, the second count with submitting false expenses against a client's account, and the third with improperly withdrawing M & E funds as a gift from a client to himself.

The Special Master found on the first count that respondent had submitted thirty-four false requests for disbursements from September 4, 1986, to November 21, 1989, and had received "$21,-

636.32 in either goods, services or cash to which he was not entitled." On count two, he determined that respondent had obtained $4,483.95 in false disbursements.

Count three involved a $53,450 gift to respondent from a client for respondent's diligent and successful efforts in handling one matter. The Special Master found that respondent had executed a check request for the $53,450 from M & E funds and had listed the reason as "for payment of closing proceeds." According to the Special Master, respondent did not reveal to M & E that this payment represented a gift from a client, and thus prevented the firm from considering whether it would prohibit the acceptance of the gift or whether the gift was the property of the partnership. The Special Master found that respondent's conduct constituted dishonesty, deceit, and misrepresentation in violation of *Rule* 8.4(c).

–I–

The Disciplinary Review Board (DRB) sustained the Special Master's finding that respondent was guilty of unethical conduct. The DRB, however, based its conclusion on the findings involving counts one and two, but not on those concerning count three. A majority of the DRB recommended a three-year suspension. The three lay members dissented. Citing respondent's "extensive ($25,000) and extended (three years)" theft from his partners, the dissent recommended disbarment.

Our independent review of the record leads us to agree with the DRB that respondent's acceptance of the gift, as alleged in count three, did not clearly and convincingly violate *Rule* 8.4(c). We find, however, that the evidence clearly and convincingly establishes that respondent knowingly misappropriated funds from his partners. Respondent's repeated deception compels disbarment.

–II–

The Decision and Recommendation of the DRB summarized the charges and relevant evidence relating to counts one and two as follows:

Beginning in 1986 and through the end of 1989, respondent converted in excess of $25,000 in funds belonging to M & E by submitting false requests for disbursements drawn against "unapplied retainers," [which are] monies collected and owned by M & E as legal fees, but not yet transferred from the clients' files to M & E's accounts. * * *

It was through the use of those unapplied retainers that respondent's carefully contrived scheme to divert M & E funds for his personal benefit succeeded, went undetected for three and one-half years and might have remained unexposed if not for M & E's discovery, soon after respondent's departure from the firm, of a questionable American Express charge to a client's file. * * *

By way of illustration of a personal expense paid by M & E's funds through artifice on respondent's part, on July 10, 1987 and June 15, 1989, respondent signed disbursement requests for $689 and $530 respectively, listing the purpose therefor as "surveyor charges" owed to Coviello Brothers, Inc. in two real estate matters. In reality, that business concern was a professional landscaping service that had landscaped respondent's residence. Other false disbursement requests (thirty-four in all) covered payments for respondent's personal tennis club fees (totalling $1,700), theatre tickets ($3,000), personal legal fees ($3,000), dental expenses ($645), mortgage service fee in connection with his mother-in-law's residence ($1,797.50) and sports memorabilia ($9,000). In every instance, the payees were not fictitious; only the stated purpose for the expense was illegitimate. * * *

Additional false expenses, totalling $4,483.95, are listed [in] * * * [c]ount [t]wo of the formal complaint. In that case, M & E represented Chemical Bank on various matters for which respondent was the billing attorney. Under M & E's bookkeeping system, each matter had an individual number. Between April 30, 1989 and December 31, 1989, respondent transferred unapplied retainers from various Chemical Bank matters to [a] single account, denominated Chemical General account, thereby creating a fund of unapplied retainers in the amount of $15,392.21. Thereafter, between June 1, 1989 and December 31, 1989, respondent [totally] depleted the $15,000 fund * * *.

Specifically, respondent submitted numerous false disbursement requests to M & E to cover the payment of $4,483.95 in personal expenses * * *.1 * * *

## Regarding the third count, the DRB found:

Count Three charged respondent with improperly keeping $53,450 that should have gone to M & E's accounts but that respondent, instead, disbursed to himself as a gift from a client, the Asbury Park Press ("The Press"). * * *

* * * From 1984 through 1988, respondent worked on a * * * complex and lengthy matter, which resulted in substantial profits to the Press * * *. [At the close of the matter, the Press] issued instructions to respondent on how to disburse

---

1 As correctly found by the Special Master, out of the $15,000 in false disbursements charged in [c]ount [t]wo of the complaint, $3,701.32 are duplicated in [c]ount [o]ne and should be subtracted form the $8,185.27 in total false disbursements contained in [count two of the complaint], leaving a balance of $4,483.95.

$1.5 million in closing proceeds deposited in M & E's accounts. The disbursements included a $50,000 reward to respondent for his personal efforts * * *. The sum of $3,450 in accrued interest on the $1.5 million [in] funds was also to be disbursed to respondent as a gift. The $53,450 sum was not intended to be given to M & E * * *. In fact, were respondent unable to accept the gift because of any policy within the firm, the Press expected that the monies would be returned to it.

Consistent with the Press' directives, respondent signed disbursement requests for checks payable to all individuals named by the Press, including himself. * * * He labelled his own $53,450 check as "payment of closing proceeds."

Respondent neither sought approval from M & E to accept the gift nor informed the firm of the Press' wish to give him a monetary reward. [Also,] * * * he was not aware of any M & E policy requiring an affirmative duty to obtain the firm's approval to the gift. * * * [I]t is undisputed that there was no agreement governing the receipt of gifts by partners * * *.

Following the discovery of respondent's improprieties * * *, it was agreed that respondent's $165,000 share of the firm's capital account would be offset by certain sums unduly kept by respondent, including the $50,000 gift from the Press. Ultimately, respondent received $125,000 from his share in the capital account. [Footnote omitted.]

The DRB found that respondent's acceptance of the gift from The Press may have been imprudent, but in the absence of an established firm policy prohibiting such gifts did not clearly and convincingly demonstrate deliberate concealment. Thus, the DRB concluded that respondent's conduct in count three did not violate *Rule* 8.4(c).

In contrast, the DRB determined that respondent's repeated deceitful misappropriation of M & E funds, as enumerated in counts one and two, "was unethical and extremely serious." Although the DRB stated that theft by an attorney, irrespective of the source of the funds, must never be tolerated, it concluded for two reasons that disbarment was not appropriate. First, the majority reasoned, because this is a case of first impression in this State, respondent did not have notice that misappropriating funds from his partners could result in disbarment. Second, the majority pointed to respondent's outstanding record as an attorney. The majority concluded that respondent's actions warranted a three-year suspension.

The dissent disagreed:

We unhesitatingly vote to disbar.

       \*       \*       \*       \*       \*       \*       \*       \*

[Respondent's] achievements and impeccable reputation as a lawyer, lecturer and law professor are undeniably impressive, but they should not serve to mitigate the extensive ($25,000) and extended (three years) swindle of his own partners' funds, just as nothing will serve to mitigate theft of clients' funds. In like manner, [respondent's] acknowledgment of his piracy and restitution to his partners should not merit great commendation, particularly in light of the unavoidable suspicion that contrition ensued only because he had the bad luck of being apprehended.

No one will deny that [respondent] committed an act of moral turpitude. He embarked on a prolonged deceitful scheme to plunder his partners' money, a scheme that ultimately put $25,000 in his pocket. And he did so surreptitiously, unlike the examples he cited of perceived abuses by other partners. While, arguably, some of his partners' conduct might have been irregular, it was not unethical, illegal or shrouded in secrecy, like his. To submit to the bookkeeper a receipt for a personal lunch and to say "pay it" is a far cry from fabricating disbursement requests that, on their face, give clear notice to the firm that the expenses had been incurred for the benefit of clients. The first example could be called an internal firm dispute; the second is called thievery.

\* \* \* \* \* \* \* \*

\* \* \* It is our unshaken conviction \* \* \* that, in this case, this attorney must be disbarred. We see no other appropriate discipline for an attorney who stole considerable sums from his law partners—an association that requires reliance, confidence and trust—not once, not twice, but on thirty-four separate occasions stretched over a period of three years. [Footnote omitted.]

Our independent review of the record leads to our acceptance of the DRB's findings of fact. We conclude, however, that disbarment is required. In reaching that result, we focus on respondent's actions as specified in counts one and two.

–A–

Both the Special Master and the DRB enumerated thirty-four separate specific acts of deceit, spanning three years. Those acts reveal that respondent undertook a " 'pattern of activity' " to defraud his partners. *In re Spina*, 121 *N.J.* 378, 390, 580 *A*.2d 262 (1990). Conduct that involves so many acts over so long a period cannot be considered, as respondent contends, "aberrational." We see no ethical distinction between a lawyer who for personal gain willfully defrauds a client and one who for the same untoward purpose defrauds his or her partners. See *Attorney Grievance Comm'n of Maryland v. Nothstein*, 300 *Md.* 667, 480 *A*.2d 807, 817 (1984). In the absence of compelling mitigating factors justifying

a lesser sanction, *Attorney Grievance Comm'n of Maryland v. Ezrin*, 312 *Md.* 603, 541 *A*.2d 966, 969 (1988) (citing *Nothstein, supra*, 480 *A*.2d at 807; *Attorney Grievance Comm'n of Maryland v. Harper*, 300 *Md.* 193, 477 *A*.2d 756 (1984); *Attorney Grievance Comm'n of Maryland v. Pattison*, 292 *Md.* 599, 441 *A*.2d 328 (1982); *Attorney Grievance Comm'n v. Burka*, 292 *Md.* 221, 438 *A*.2d 514 (1981)), which will occur quite rarely, see *In re Wilson*, 81 *N.J.* 451, 461, 409 *A*.2d 1153 (1979) (stating that mitigating factors will rarely override requirement of disbarment when attorney misappropriates client's funds), misappropriation of firm funds will warrant disbarment.

We reject the assertion that respondent's lack of notice compels a lesser sanction. In *Spina, supra*, 121 *N.J.* at 390, 580 *A*.2d 262, we disbarred an attorney who pled guilty to the federal misdemeanor of taking property belonging to his employer. Spina's misappropriations occurred over a two-and-one-half-year period. Among other things, he submitted false reimbursement claims and deposited in his personal checking account checks intended as contributions to his employer. *Id.* at 380, 580 *A*.2d 262. Adopting the DRB findings, we found "immaterial" that Spina's conduct had not occurred in the context of a lawyer-client relationship. *Id.* at 384, 580 *A*.2d 262. Likewise, Spina's conduct towards his employer " 'constitute[d] irrefutable evidence of a profound lack of professional good character and fitness.' " *Id.* at 384–85, 580 *A*.2d 262 (quoting *In re Templeton*, 99 *N.J.* 365, 367, 492 *A*.2d 1001 (1985)). In rejecting the contention that disbarment is inappropriate because the case is of first impression, we are impressed by the DRB dissent, which saw no ethical distinction between the prolonged, surreptitious misappropriation of firm funds and the misappropriation of client funds.

In other states, the misappropriation of partnership funds has led to disbarment. In *Nothstein, supra*, 480 *A*.2d at 818, the Maryland Court of Appeals disbarred an attorney who had submitted $40,000 of false expense claims to his law firm. Similarly, in *Ezrin, supra*, 541 *A*.2d at 969, the same court disbarred an attorney who had misappropriated $200,000 of his partners' money

over three years. The court stated that such misappropriation "involves moral turpitude; it is an act infected with deceit and dishonesty * * *." *Ibid.*

The Supreme Court of Missouri, in a similar case, disbarred an attorney who admitted to misappropriating over $40,000 by fraudulently charging client accounts. See *In re Maier*, 664 *S.W.*2d 1, 2 (1984). Maier had falsely represented that the funds were to pay third parties for services. In an attempt to cover his conversion, he compounded the fraud by inflating client bills. The Missouri court, recognizing that disciplinary proceedings are designed primarily to determine an attorney's fitness to continue as a member of the bar, noted that Maier had "betrayed the trust of his firm" and "dishonored the profession." *Id.* at 2. Consequently, the court concluded that allowing Maier to remain a member of the bar "would be inimical to the public confidence essential for the effective administration of justice." *Ibid.*

The Appellate Division of the New York Supreme Court disbarred an attorney who had misappropriated $8,800 in client payments from his firm over an eleven-month period. See *In re Salinger*, 88 *A.D.*2d 133, 452 *N.Y.S.*2d 623, 625 (1982). Salinger, the managing lawyer at a branch office of Jacoby & Meyers, concealed his fraud by instructing numerous clients to make checks for legal fees payable to him directly and by pocketing cash payments. *Id.* 452 *N.Y.S.*2d at 624. Commenting on Salinger's deceit, the New York court iterated its view that "any attorney who converts funds entrusted to his custody is, presumptively, unfit to be a member of the Bar." *Ibid.* (citing *In re Marks*, 72 *A.D.*2d 399, 424 *N.Y.S.*2d 229 (1980)).

In *In re Selden*, 107 *Wash.*2d 246, 728 *P.*2d 1036 (1986), an associate was disbarred for cashing and keeping the proceeds of client checks made payable to him for legal services. During an eight-month period, Selden deposited to his own bank account approximately thirty checks totaling $6,810.40 from twenty clients. *Id.* 728 *P.*2d at 1039. Selden, like respondent here, argued that the matter was an internal dispute that did not warrant disciplin-

ary action. The Washington Supreme Court responded: "To characterize extensive and repeated thefts from [one's] firm * * * and concealment of client ledgers as no more than an 'intrapartnership accounting dispute' is an affront to the profession and its disciplinary procedures." *Id.* at 1040. The court concluded that Selden's repeated misappropriation of firm funds in conjunction with his attempts to conceal his fraud warranted disbarment. *Id.* at 1037–38.

These opinions make clear that knowingly misappropriating funds—whether from a client or from one's partners—will generally result in disbarment. Although the relationship between lawyers and clients differs from that between partners, misappropriation from the latter is as wrong as from the former. A plainly-wrong act is not immunized because the victims are one's partners. We are unpersuaded by respondent's argument that he lacked constructive notice that the misappropriation of partnership funds could result in disbarment. Respondent concedes that his conduct was clearly improper. In mitigation, he offers three considerations: personal problems, a prior record that is both unblemished and distinguished, and disillusionment with the conduct of other partners at M & E.

–B–

We recognize that a respondent's "[p]ersonal or emotional problems are mitigating factors" in a disciplinary proceeding. *In re Kasdan*, 115 *N.J.* 472, 490, 559 *A.*2d 411 (1989). The mitigating factors here, however, are not persuasive. Concerning respondent's personal problems, in 1987 his father became emotionally dependent on him following the death of respondent's stepmother. That same year his father was hospitalized for several months because of an automobile accident. His father then developed prostate cancer. Respondent's wife underwent spinal surgery after the birth of their second child. One of respondent's children developed a serious ear problem that was not diagnosed for three years. Another child had a learning disability. We are not

persuaded that these circumstances impaired respondent's judgment and caused him to commit the offenses. Many lawyers have suffered far worse without stealing from their clients or their partners. We cannot excuse respondent without exonerating every lawyer who suffers personal hardships and misappropriates funds.

■ Respondent accurately points to his record of service to his clients, the profession, and the community. His record is indeed outstanding. It includes active involvement in charitable activities. He was a partner in one of this State's most successful law firms and an adjunct professor at two law schools. He served as a volunteer lecturer in programs of continuing legal education and served as chairman of the Taxation Section of the State Bar Association. The egregiousness of respondent's dishonesty should have been readily apparent to so distinguished a practitioner. Although good reputation, prior trustworthy professional conduct, and general good character are often considered as mitigating factors, *see, e.g., In re Infinito*, 94 *N.J.* 50, 57, 462 *A.*2d 160 (1983), their importance is diminished "where misappropriation is involved." *Wilson, supra*, 81 *N.J.* at 459–60, 409 *A.*2d 1153.

Finally, respondent attributes his misconduct to disillusionment with the "firm culture" at M & E. He argues that "partners were using the firm as their own source of personal funds for meals with friends, travel expenditures and conventions." Respondent claims that his repeated complaints to senior partners about implementing tighter controls "fell on deaf ears." Consequently, according to respondent, he vented his frustrations by "conduct[ing] himself in the same manner in which he perceived others at the firm to be conducting themselves." Although respondent concedes that "this was an immature and wrong response," he alludes to his perception of M & E's "firm culture" in the late 1980s as a mitigating factor.

The respondent in *Maier, supra*, 664 *S.W.*2d at 2, similarly argued that his firm had undervalued his services and underpaid him. To this, the Missouri Supreme Court responded that "[s]uch

rationale offers little or no justification for respondent's conduct." *Ibid.* Likewise, the respondent in *Ezrin, supra,* 541 *A.*2d at 968, offered the testimony of a psychiatrist who found that respondent's "resentment of his partners' [perceived] actions [in taking undue advantage of him] manifested itself, as a substitute for communicating his anger, in the theft of the partnership's funds." Also, the associate in *Selden, supra,* 728 *P.*2d at 1037, believed that he deserved, and had been promised, a bonus from the firm for which he worked. Throughout the disciplinary process, the associate sought to justify his actions on these grounds although he admitted that the misappropriation was wrong. *Ibid.* All these respondents were disbarred.

■ Frustration and disillusionment with one's "firm culture" and dissatisfaction with one's pay do not excuse misuse of partnership funds. Respondent's extended misappropriation of firm funds, as enumerated in counts one and two, calls for disbarment.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—6.

*Opposed*—None.