IN THE MATTER OF HARRY L. CORNISH, AN
ATTORNEY AT LAW.

March 18, 1985.

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that HARRY L. CORNISH of PATERSON be suspended from the practice of law for a period of five years, retroactive to January 4, 1980, the date of his continued temporary suspension, and good cause appearing;

It is ORDERED that the report of the Disciplinary Review Board is hereby adopted and that HARRY L. CORNISH is suspended from the practice of law for a period of five years and until further order of this Court, retroactive to January 4, 1980; and it is further

ORDERED that respondent is restrained and enjoined from practicing law during the period of his suspension and is further directed to continue his compliance with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

### Decision and Recommendation of the Disciplinary Review Board

This matter is before the Board based upon a presentment filed by the District XI (Passaic County) Ethics Committee.

Respondent is charged in two complaints with misappropriation of funds belonging to clients, contrary to *DR* 9-102, and with failing to cooperate with the District Ethics Committee investigation, contrary to *DR* 1-102.

I

The charges are summarized as follows:

MC KNIGHT MATTER

On May 30, 1979, Respondent represented Nathaniel and Joyce McKnight concerning the purchase of property at 172 East 32nd Street, Paterson. It was alleged that Respondent retained funds in his trust account to discharge various liens, but instead applied all or parts of the money to other uses.

EWING MATTER

On July 7, 1978, Respondent represented Connie Ewing regarding the purchase of property at 548-550 East 22nd Street, Paterson, and retained money at the closing in his trust account to discharge a mortgage held by the Howard Savings Bank, but instead applied all or part of the money to other purposes.

Respondent admitted that he committed the acts of misconduct charged in these complaints against him. He offered in mitigation the fact that he was in a "depressed and disorganized state" of mind and misused clients' money in his attempt to dissolve his sole practice of law.

The factual context of Respondent's derelictions was extensively developed at the Ethics Committee hearing. The Ethics Committee hearing focused upon Respondent's misappropriation of trust funds in the Ewing and McKnight matters. In Ewing, Respondent represented Connie Ewing as the purchaser in a real estate closing held on July 7, 1978. He received a total of $30,699.22 in escrow, which was to be disbursed on behalf of Ms. Ewing. On July 7, 1978, Respondent issued trust checks in the amount of $10,444.58 related to this closing. He failed, however, to remit payment of $18,797.89 to Howard Savings

Bank (Howard) to pay off the seller's mortgage. His failure was attributable to the fact that shortly after the closing, he realized that he had a shortage of approximately $3,000 in his trust account. His bank statement as of July 31, 1978 reflected a balance of $16,757.27. Respondent, apparently, was not pressed by Howard for payment. On November 27, 1979, counsel for Howard reported the failure to pay this mortgage to the District Ethics Committee. As of October 31, 1979, Respondent's trust account reflected a balance of $256.30. Respondent testified that when he initially realized that there was a shortage in his trust account, he assumed that he had at least two weeks to cover the shortage. It took much longer and he, then, mistakenly assumed that he had paid it off. Respondent did not keep individual trust ledgers and would periodically deposit his personal monies into his trust account. He therefore was uncertain as to the extent to which this money had been invaded.

In the McKnight matter, Respondent represented the purchasers in a real estate closing that took place on May 30, 1979. Respondent received a total of $49,350.00 to be disbursed. At the time of the deposit, his trust account was overdrawn by $709.95. During June 1979, Respondent disbursed $12,597.45 relative to this closing. On July 27, 1979, he paid $27,595.14 to the Essex Union Mortgage Company to satisfy the sellers' first mortgage. During August 1979, Respondent's trust account check for $8,780.67 to the First National State Bank in satisfaction of the sellers' second mortgage was twice returned for insufficient funds. After a deposit of $2,400 on August 29, 1979, the check cleared on September 4, 1979. The trust account at that time had a balance of $256.30. There was no further activity in that account.

## II

Respondent was graduated from Howard University, Washington, D.C., in 1967 with a Bachelor's degree in political

science and later from its law school. He was in the top one-third of both classes. On December 24, 1970, he married his wife who also was a student at Howard University and later its law school. Respondent returned to his home town of Paterson, New Jersey, and was employed by the Passaic County Legal Aid Society. He was admitted to the Bar in 1971. In the following year, he and another attorney, the only black attorneys in Paterson, decided to form a partnership. At age 27, Respondent entered private practice imbued with the University's philosophy that a graduate had an obligation to return to the community and help other blacks. Most of the clients that this new partnership attracted were in lower income brackets. The partnership was described as a poverty type practice.

The law partnership was very active. People would come to the Cornish home or would call at all hours of the day, seven days a week. The Cornishes could not walk out of their home or drive anywhere without someone stopping Respondent and asking for his advice. Usually, he did not bill these people because they were friends.

Several of Respondent's friends and business associates referred clients to him, of whom only a small percentage paid for the legal services they received. Respondent did not charge the prevailing rate since he knew they could not afford it. Respondent had difficulty collecting his accounts. It "seemed that everybody had a sadder story than he did". Not being an aggressive person, he was taken advantage of by many clients. One business associate said of Respondent:

> His heart was too big and he very seldom turned them [clients] away. Whether they had money or not. He took a lot of problems.
>
> [H]e wasn't hardened enough to turn the people away when they came to him with problems.

As Respondent struggled to make his law career a success, he became disillusioned with the private practice of law. He testified at the District Committee hearing:

> I had no idea of what private practice was all about when I first started. I had the old romantic notion of what it was all about. I was very disappointed when

I found that I really didn't like what I was doing * * *. I didn't like the business aspect of it and I don't think I was really challenged intellectually based upon the type of cases I was forced to do to make a living.

In 1974, Respondent's wife became employed as a corporate attorney in New York City and devoted her efforts in establishing her career. As her husband struggled to make a subsistence living, she achieved recognition in her corporate career, eventually becoming the assistant corporate secretary. The Cornishes did not discuss their careers or business problems with each other because before marriage they had agreed that they would not do so. Since Mrs. Cornish worked in New York City, it became Respondent's responsibility to care for their two young children. He would make them breakfast each morning and then drive them either to nursery school or to the babysitter before he went either to court or his office. At 4:30 p.m. each day, he would pick them up, take them home, and fix dinner.

Financial pressures caused Respondent's partnership to dissolve in 1975. Both he and his partner had decided earlier that the first one who found other employment would leave the firm. Respondent's efforts to find other employment were unsuccessful. Around this time, Mrs. Cornish began noticing a change in her husband's attitude. He was no longer devoting his time to his clients. Brief cases brought home full of work remained unopened. He complained about the interruptions caused by clients. His previous concern about being neatly dressed gave way to wearing jeans and pullover shirts purportedly so he could identify with his clients. Household chores remained untouched. When Respondent complained, his wife felt he lacked ambition and was taking advantage of her because her career was succeeding while his was not. She dismissed his complaints about caring for the children as being chauvinistic.

Respondent realized that he no longer liked the private practice of law. By 1977, he "disliked it intensely." He had been told that it took five years to establish a private practice. Five years had gone by and he felt he was no better off than when

he started. He reached a point where he felt that his personal and professional life was a shambles. With the type of cases he had, he realized that there was no way he could ever earn a decent living without being pressured every day and working 12–14 hours a day just to break even. His future, in his mind, offered nothing.

Some friends sensed that he was under strain and pressure. When they tried to talk to him about it, he would turn the conversation. One friend described Respondent as being the type of person who would not tell his problems to others, but would try to solve them himself. Respondent withdrew from social contact, increasing his feeling of isolation. Quietly, he harbored bitterness toward those around him. He needed help and thought that those closest to him should have tried to help him without his asking them.

His stomach ulcer, diagnosed before law school, became aggravated. Daily he took nonprescription medication for it. As he continued to struggle with his private practice, he noticed the change in his mental outlook and his deteriorating physical condition. "I disliked myself intensely at that point," he said. Mrs. Cornish noticed that her husband looked and acted like a sick person. He had no energy, was not eating or sleeping properly. Although she tried to persuade him to see a doctor, he refused. Mrs. Cornish told Respondent that she was divorcing him because she could no longer communicate with him and did not understand the reason for it. In 1979, Respondent reached his low ebb. He told his wife that he wanted to be a truck driver and get away from all the problems. However, not recognizing his problems, she dismissed his complaints. His feelings of isolation increased.

Respondent reached a point where he could no longer handle the pressures.

Going to my office was like going into a prison. I would sit around all day and look at the walls, close my door, and the secretary out there in the main office who would answer my calls for me and tell people I wasn't there, people came

in and she would tell them I wasn't in. This went on for a good six months before, before I just walked away from the whole thing.

He did not want simply to abandon his office. He felt that he had to dissolve his practice in an orderly fashion. Desperate to work out his problems and to close his office, Respondent began returning retainers to his clients so they could seek legal assistance elsewhere. He used clients' trust money to do this and to pay his office expenses so he could buy time and "get the pressure off." While recognizing his moral culpability, Respondent continued to misuse his trust account because he was now in so deep. He continued to hope he could resolve his problems himself without having to ask his wife or relatives for help. His business records were not accurate; he recorded some transactions, but not others. Since he had not reconciled his accounts, he did not realize that he did not have sufficient funds to cover checks for the McKnight account. As a consequence, an $8,780 check was returned for insufficient funds.

Three complaints were filed with the Ethics Committee against Respondent in July 1979 by Samuel and Joyce Jefferson, Jr., Ezekiel DeLoach, and Thomas Funn. A complaint on behalf of Nathaniel and Joyce McKnight was filed in September 1979 and a complaint on behalf of Connie Ewing was filed in November 1979. Respondent in answers to the McKnight and Ewing complaints admitted the acts of misconduct, but argued in mitigation that the emotional and financial pressures of private practice upon him as a black attorney in an economically disadvantaged black community caused him to suffer a psychological breakdown.

An order was entered by the Supreme Court on December 4, 1979 temporarily suspending Respondent from the practice of law. This suspension was continued on January 4, 1980 pending final determination of the ethics complaints against Respondent. Respondent had not told his wife that he had been suspended. She later learned of it when she discovered that he had not paid into the Clients' Security Fund. She learned of the

Ethics Committee complaints against him only in either November or December of 1980.

On May 30, 1980, Respondent was taken at his wife's and relatives' insistence to the hospital emergency room because of a three-day pain in his right lower quadrant. He was admitted with a diagnosis of possible cholecystitis or renal stone. The final diagnosis was chronic deformity of the duodenal bulb and essential hypertension. He was discharged on June 5, 1980. At the insistence of his internist, Respondent commenced treatment with a psychiatrist, Dr. John H. Chilman, a diplomate of the American Board of Psychiatry and Neurology. Respondent complained of depression, headaches, gastrointestinal symptoms, insomnia, poor concentration, and general fatigue. From a history of Respondent, Dr. Chilman concluded that the cause of Respondent's condition was a combination of domestic and professional pressures. He felt Respondent's condition began before 1978 and was shocked that Respondent had not sought professional help for three to four years. This delay exacerbated the underlying condition and ruled against a spontaneous recovery.

### III

The Ethics Committee conducted a hearing on April 23, May 11, and September 10, 1981 concerning the McKnight and the Ewing complaints. During those proceedings, Dr. Chilman testified that Respondent suffered from a depressive neurosis, explaining that Respondent had been fully aware of his actions, but was impaired in his ability to concentrate and focus intelligently on the issues before him. The doctor said that if Respondent had not been so severely depressed, he would not have misused the trust funds.

> [H]e would have somehow closed his private practice without resorting to the kind of the blind almost desperate maneuvers he did resort to in order to get out of his private practice.

Dr. Chilman believed that Respondent was too compassionate for his field and was not a hard-headed business man. Respon-

dent had compassion for his clients' inability to pay. He believed that Respondent would have liked to have succeeded in his private practice, but that this was impossible for him.

Dr. Chilman saw Respondent

as a basically honest man who has departed from the straight and narrow path rather than specifically a dishonest man who was found out. In his own confused way at that time, he presumably felt somehow that it was justifiable, but I see it as a very distinctly different thing from the kind of man who would do this to buy his wife a mink or diamond necklace. It is not that kind of a response, it is desperate trying to get out from under the pin.

Respondent had conceded to Dr. Chilman that he had acted very foolishly in his attempt to close his private practice by using clients' funds. The psychiatrist said that Respondent's self image was one of high ethical values and integrity, and the realization that he had violated his own code of conduct was very burdensome to him. In the doctor's opinion, the prognosis of Respondent was excellent. He said that Respondent should not return to the type of practice that had created his medical condition, but that he could return to law in other fields. Dr. Chilman also saw no reason why Respondent should not be permitted to handle funds, explaining that what had happened to him was a manifestation of his sickness; Respondent's ethics were sound. He added:

I don't see him as a danger to the public or to his clients or to whoever. Even if at some future date he were to have a recurrence of depression, he would identify it and take action.

In response to this Board's request, Dr. Chilman reported by letter dated July 30, 1984 that by the end of 1983, he had considered Respondent "essentially cured" and is now "completely free of all psychopathology." He said there was "no psychological factor that would be an impediment to his resuming the practice of law."

At the Ethics Committee hearings, business associates and friends of Respondent attested to his high ethical standards and competency. They also related how they had referred many people with legal problems to Respondent who often represent-

ed them without charge. After considering the testimony, the Committee stated that it

> could not help but be touched and moved by the testimony of Respondent and his witnesses. We believe that Respondent had unwittingly been "used" by his friends, and others, including clients. They did not intend to do this and probably do not even realize that this was the actual consequence of their actions in referring a steady stream of nonpaying clients to Respondent. Respondent was no longer working with Legal Aid but now had to make a living and support a family.

The Committee found that Respondent was instilled with a high standard of morality that "kept hold to such a degree at least that no one got hurt financially." Full restitution was made to all clients. Finding that Respondent had committed acts of misconduct, the Committee believed that Respondent's psychiatric illness and the circumstances in which it arose warranted special consideration.

Concerning the charge of failing to cooperate with the Ethics Committee investigation, the Committee found as a fact that "[m]edically he was not up to the task and could not perform it until just before the last hearing date." The Committee noted that Respondent and his attorney fully cooperated in preparing the documents and records for the final hearing. The Committee unanimously recommended that Respondent remain suspended from the practice of law until such time that he may be certified as capable of returning to the practice of law.

Pursuant to Rule 1:20–2(h), the Ethics Committee Chairman dismissed other pending complaints against Respondent because he felt that it was unlikely that they would develop any new information about Respondent's general fitness to practice law. These complaints filed on behalf of the Jeffersons, De-Loach, Funn evidenced gross negligence and a failure to carry out his contracts of employment. Respondent acknowledged his misconduct in these complaints in a stipulated dismissal. Whereas the Board has considered them as part of the totality of his misconduct, the medical and psychiatric evidence proferred in mitigation would be applicable.

## IV

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Ethics Committee in finding Respondent guilty of unethical conduct are fully supported by clear and convincing evidence.

Respondent acknowledged before the Ethics Committee that he had committed acts of misconduct that violated *DR* 9–102 by using trust funds of his clients to repay to other clients their retainers so he could dissolve his law practice. He offered in mitigation extensive testimony that he was suffering from a psychiatric illness that clouded his reasoning during the critical period of 1978-9.

Almost from the outset of his private law practice in 1972, Respondent recognized that he was not suited for this career. Clients frequently took advantage of him. He could not turn people away, and provided legal services without charge. The career achievements of his wife placed greater family responsibilities upon him. Respondent's partnership was dissolved because of financial reasons. Respondent, unable to find other employment, struggled alone with the law practice. Seeing no hope for the future, he grew to dislike the practice of law intensely. His earnings were minimal. As his depression deepened, his psychological condition deteriorated to the point that he ultimately resorted to misappropriation in order to terminate his law practice.

Nevertheless, Respondent committed serious acts of misconduct. "His transgressions reflect on the competency and integrity of the entire Bar." *In re Barry*, 90 *N.J.* 286, 291 (1982). Whereas misappropriation of clients' trust funds generally mandates disbarment, *In re Wilson*, 81 *N.J.* 451 (1979), this mandate is not retroactive, *In re Smock*, 86 *N.J.* 426, 427 (1981). Thus, mitigating factors may warrant discipline less severe than disbarment. *Id.*

There are substantial mitigating factors in this case. The sorry history of Respondent's unsuccessful venture into private

practice reflects a picture of a young, altruistic attorney who upon the inception of his practice got in over his head. See *In re Barry, supra*, 90 *N.J.* at 291. His laudable commitment to the black community resulted in his operating beyond his capacity.

The Board notes that all the witnesses who testified before the Ethics Committee attested to Respondent's high ethical standards and that such misconduct on his part was an aberration. Respondent had made full restitution to all his clients. No claims were ever filed with the Clients' Security Fund. He ultimately cooperated with the Ethics Committee in resolving this matter after his depression was in remission. He has complied with his temporary suspension and has not practiced law.

The Board agrees with the Ethics Committee finding that based on the testimony of Dr. John H. Chilman, a psychiatrist, Respondent's serious illness began before 1978 and prior to his misappropriations. It had impaired his reasoning. The Board finds persuasive the doctor's opinion that Respondent was a basically honest person who succumbed to overwhelming psychological pressures.

In response to this Board's request for an updated opinion of Respondent's condition, Dr. Chilman stated:

In my opinion, he is completely free of all psychopathology at this time, and there is no psychological factor that would be an impediment to his resuming the practice of law.

Therefore, the Board recommends that Respondent be suspended from the practice of law for a period of five (5) years retroactive to the date of his continued temporary suspension on January 4, 1980.