744 A.2d 162

IN THE MATTER OF JUDE J. TONZOLA,
AN ATTORNEY AT LAW.

Argued September 27, 1999—Decided January 28, 2000.

*Michael J. Sweeney,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*William R. Connelly* argued the cause for respondent (*Connelly & Manfredi*, attorneys).

PER CURIAM.

This is an attorney disciplinary matter. It arises from a motion for final discipline filed by the Office of Attorney Ethics (OAE) before the Disciplinary Review Board (DRB). The motion is based on the criminal conviction of respondent, Jude J. Tonzola, for forgery and theft. In a decision dated November 18, 1996, the DRB concurred in the OAE recommendation that respondent be disbarred. We remanded the matter to permit the parties the opportunity to supplement the record in respect of respondent's claim of a medical condition (manic depression-bipolar disorder) as a mitigating factor. On May 10, 1999, the DRB reaffirmed its decision to disbar respondent.

We have conducted an independent review of the record as provided by *Rule* 1:20–16(c). In so doing we have relied upon *Rule* 1:20–13(c)(1), which provides that a criminal conviction is conclusive evidence of respondent's guilt, and carefully considered the asserted mitigating factors. We hold that respondent should be disbarred.

I.

A.

Jude J. Tonzola was admitted to the New Jersey bar in 1986. In the early stages of his career, respondent might have been considered a role model. He graduated from East Side High School in Newark as class valedictorian, earned his bachelor of arts degree at Princeton University, and earned his law degree at Seton Hall Law School, where he was an editor of the law review. During varying periods between 1986 to 1993, respondent worked at different law firms, the names of which are not relevant to the disposition of this matter.

In December 1993, respondent, along with partners Richard S. Panitch and G. Daniel Nider, formed the firm of Tonzola, Panitch & Nider. The firm began doing business in February 1994. Respondent's partners encountered, in their words, "problems with Tonzola" early in their relationship. More specifically, in a joint statement submitted to the OAE, the partners claimed that respondent failed to submit his daily time sheets, failed to prepare file memoranda used by the firm's case management system, and failed to arrange for the delivery of certain client files promised by respondent as a basis for the initial formation of the firm. They also assert that respondent lied about his whereabouts (for example, he would claim to be in court on client business when he was not), charged personal expenses on the firm credit card, and was repeatedly absent from work.

Respondent's partners grew concerned. In early April 1994, they insisted that respondent see a psychiatrist as a condition of their continued association. Respondent agreed and Dr. Howard Gross was selected to conduct the evaluation. According to the partners, Dr. Gross informed them that respondent suffered from "depression with an obsessive-compulsive lying component." That opinion was formed partly on the basis of three patient visits. The partners also indicated in their statement that Dr. Gross expressed the view that respondent's condition was "fully treatable with medication" and that he could continue to practice law with appropriate supervision.

On March 26, 1995, respondent was charged in an Essex County criminal accusation with three counts of forgery, in violation of *N.J.S.A.* 2C:21–1a(2), and one count of theft by unlawful taking, in violation of *N.J.S.A.* 2C:20–3. On April 3, 1995, respondent pled guilty to one count of forgery and the theft charge. At the plea hearing, respondent admitted to the facts underlying both charges. The State dismissed the other counts.

As contained in the trial court record, the following facts formed the basis of the charges against respondent and his conviction:

*The Two Forgeries*

Gregory Policastro retained respondent to represent him in an expungement matter. (The representation spanned respondent's tenure at two law firms.) In response to the client's inquiry about the status of his case, respondent falsely represented that the expungement had been granted and that he was awaiting the court's order to that effect. Respondent thereupon took an unrelated, legitimate order signed by Superior Court Judge Edward W. Beglin, Jr., excised the judge's name using white-out or some other material, and photocopied it onto a separate sheet of paper to make it appear as an official order. He then tailored the language as expungement language and forged the judge's signature without the court's authorization or knowledge. Respondent presented the forged order to the client. That conduct occurred on or about October 8, 1993. The record also reveals that respondent had previously forged the signature of another Superior Court Judge, Eugene J. Codey, Jr., in furtherance of the same scheme. The forgery of Judge Codey's signature occurred on or about July 6, 1992.

*The Theft and Third Forgery*

Harry Romeo retained respondent to represent him in connection with the purchase of real estate. In January 1994, the client gave respondent a power of attorney to close the transaction and, for that purpose, gave respondent $27,000. Rather than utilize the funds for the closing, respondent used approximately $24,000 for his capital contribution to the Tonzola, Panitch & Nider firm and used $3,000 for his additional, personal benefit. He delivered the check for his capital contribution to the firm on or about January 27, 1994.

Respondent also misrepresented to the client the status of civil litigation related to the purchase. In furtherance of the misrepresentation, respondent forged the signature of a third Superior Court Judge, Murray G. Simon. The forgery appears on a letter dated May 2, 1994, addressed to counsel of record, purportedly

advising them of the status of the litigation. Although the record is imprecise as to exact dates, it appears that the client, unaware of respondent's misdeeds, continued to believe he was being properly represented until May 1994.

On May 22, 1995, the trial court sentenced respondent to a one-year term of probation. As special conditions, respondent was required to make restitution to the Lawyers' Fund for Client Protection in the amount of $27,000 and to write letters of apology to the three judges whose signatures he forged. After the OAE learned of the original allegations, respondent consented to a temporary suspension, which was ordered by this Court on May 26, 1994. *In re Tonzola,* 137 *N.J.* 1, 644 *A.2d* 73 (1994). The suspension has been in place since that date.

### B.

The DRB unanimously recommended disbarment on November 18, 1996. Two board members expressed their view that, although the case law compelled them to recommend disbarment, they favored a less severe discipline due to respondent's asserted manic-depressive illness and underlying bipolar disorder. On July 21, 1997, we remanded the matter to the DRB to supplement the record with expert testimony in respect of respondent's contention that his medical condition or defect should serve as a mitigating factor.

Although our remand order provided respondent and the OAE with the opportunity to request a full hearing before a special master, both declined to do so. Instead, the parties supplemented the record by submitting expert reports and relied on the briefs of counsel.

On behalf of the OAE, Daniel P. Greenfield, M.D., a psychiatrist, submitted a November 25, 1998, report (the "Greenfield report"). The Greenfield report states in part:

> With regard to the issue of Mr. Tonzola's mental states and psychiatric conditions in connection with the several incidents in question, while I accept and agree that an underlying Bipolar Disorder when not effectively treated can result in acute

impulsive behaviors, also driven by very poor social and professional judgement and grandiosity, and while I also accept and agree with Dr. Gross'[s] formulation that Mr. Tonzola was actively symptomatic with regard to his Bipolar Disorder at the time, it is nevertheless my psychiatric opinion—held with a degree of reasonable medical probability—that even if this situation were the case with Mr. Tonzola during the several specific periods of time in question in relation to the several specifically unacceptable acts and behaviors in which he engaged as an attorney (i.e., the three forgeries and misappropriation of approximately $27,000), it did not determine his mental state, ability to plan in purposeful, sequential, and goal-directed behaviors, or otherwise to impair his ability to have engaged in the complex behaviors in which he did, to the point that he was unable to do so.

Put more simply, Mr. Tonzola was motivated in all of the instances of his forgeries to have engaged in complex, goal-directed, knowing, and purposeful behaviors in effecting these forgeries in order to accomplish the goal which he felt these forgeries would do at the time. His professional and social judgement were clearly wrong, and were influenced—as described above—by his grandiosity as a symptom of his Bipolar Disorder.

Nevertheless, he engaged in these behaviors knowing that they were wrong, but hoping that they would accomplish the goals of placating his clients. . . .

Taking this analysis beyond the four incidents at issue, however, I also note that Mr. Tonzola was involved in the practice of law in other ways, and involving other cases, during the periods of time in question of these four incidents. To my knowledge, he was able to manage these other cases effectively and in some cases very well. . . .

. . . .

Using this analysis, these four situations stand out as unusual and out of context with the background of his otherwise competent and acceptable work as an attorney. Such an analysis does not permit symptomatology attributable to Bipolar Disorder—which, presumably, was ongoing and constant during the period of time in question—to selectively affect some parts of Mr. Tonzola's work as an attorney, but not all.

Put more simply and concisely, if Mr. Tonzola's Bipolar Disorder symptomatology were so overbearing and uncontrollable during the period of time in question, it should not have affected only four out of many cases on which he was working at the time.

. . . .

In summary . . . it is my psychiatric opinion—held with a degree of reasonable medical probability—that even though Mr. Tonzola's judgement was unquestionable [sic] impaired in doing what he did in connection with those incidents, and even though this impairment was a symptom of his underlying Bipolar Disorder, his basic psychiatric conditions, mental states, and abilities to engage in high-level complex and cognitively driven and determined behaviors was [sic] not.

In response to the Greenfield report, respondent's expert, Dr. Gross, submitted a report dated February 5, 1998 (the "Gross

report"). Dr. Gross disputed Dr. Greenfield's assertions and expressed the opinion that respondent's "manic depressive illness so totally destroyed his will and volition that I would have been surprised if he acted in any manner other than the way that he did." The expert also confirmed his earlier opinions expressed to the sentencing court and the DRB. The Gross report states in part:

In the final analysis, Mr. Tonzola's Manic Depression so impaired his will that his otherwise purposeful actions are excusable. And though Mr. Tonzola may have been aware that the funds misappropriated were client funds and that the utilization of those funds in the manner he did was unauthorized, his cognitive and cerebral processes concerning the nature, quality and, most significantly, consequences of those acts were totally impaired. Mr. Tonzola was totally deluded by his Manic Depression into believing that his actions would not ultimately harm his clients, and were otherwise necessary to preserve his mortal and psychic manic self, his manic ventures into decadence, and his existential notions of his place in the world.

... Mr. Tonzola's cognitive abilities and thought process during the times in question were acutely infiltrated by delusions, paranoia and grandiosity. Under those circumstances, if the measure of a person's sanity is the rudimentary ability to appreciate the nature of his or her actions and to be able to differentiate whether those actions are right or wrong, then Mr. Tonzola was not "insane" during the relevant times in question. Conversely, if the measure of a person's sanity is the totality and juxtaposition of his or her thoughts and the actions taken relative to those thoughts, then Mr. Tonzola was "insane" during the relevant times in question.

The record also includes Dr. Gross's opinion that a tumor on respondent's spinal cord, "either caused, significantly contributed to or acutely exacerbated the neurochemical imbalance that, in turn, led to his manic depressive illness." The Gross report states: "[I]t is now accepted medical wisdom that 'individuals with SCI [spinal cord injuries] will likely have significant histories of psychopathology, especially psychoactive substance use disorders and major depressive disorder[.]' " Dr. Gross theorized that the tumor, which had been removed in November 1997, had been slow-growing since respondent's birth. Although Dr. Gross stated that the tumor may have caused or contributed to respondent's illness, the expert did not state that the tumor, by itself, impaired respondent's will.

In a supplemental decision, the DRB affirmed its earlier recommendation that respondent be disbarred. The DRB emphasized that Dr. Gross was unable to state that respondent lost all appreciation of the wrongfulness of his actions, and that Dr. Greenfield observed that, despite the asserted condition, respondent was able to function properly in other settings. The matter is before us for our action pursuant to *Rule* 1:20–16(a).

## II.

For purposes of this disciplinary matter, we accept respondent's conviction as conclusively establishing the elements of the underlying offenses of forgery and theft of client funds. As we have noted:

> A criminal conviction is conclusive evidence of respondent's guilt in disciplinary proceedings. No independent examination of the underlying facts is necessary to ascertain guilt. The only issue to be determined is the quantum of discipline to be imposed.
>
> [*In re Goldberg,* 142 *N.J.* 557, 565, 666 *A.*2d 529 (1995) (citations omitted).]

Once the elements of an offense have been established, our analysis shifts to the appropriate discipline to be imposed. In that regard, we generally consider the nature and circumstances of the infraction, together with any mitigating factors. *In re Spina,* 121 *N.J.* 378, 389, 580 *A.*2d 262 (1990); *In re Lunetta,* 118 *N.J.* 443, 445–46, 572 *A.*2d 586 (1989). "[T]he Court's goal is to protect the interests of the public and the bar while giving due consideration to the interests of the individual involved." *In re Litwin,* 104 *N.J.* 362, 365, 517 *A.*2d 378 (1986).

When the offense, however, involves misappropriation or theft of client funds, disbarment is "almost invariable." *In re Wilson,* 81 *N.J.* 451, 453, 409 *A.*2d 1153 (1979). Disbarment is all but certain in misappropriation cases unless there has been a "demonstration by competent medical proofs that respondent suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful." *In re Jacob,* 95 *N.J.* 132, 137, 469 *A.*2d

498 (1984). We use the *"Jacob* standard" here to determine whether respondent has submitted proofs sufficient to justify a sanction less than disbarment.

## III.

The OAE argues that the analysis provided by respondent's expert, Dr. Gross, is flawed in that it does not account for respondent's continuing misconduct after the period in which he began treatment. The OAE also asserts that even accepting as fact that respondent suffered from some form of bipolar disorder or other condition during the periods in question, that circumstance does not satisfy the *Jacob* standard.

Consistent with the thrust of Dr. Gross's report, respondent argues that his illnesses so overcame and destroyed his will that he was unable to arrest his urges to misappropriate and forge. Accordingly, respondent argues that he has satisfied the *Jacob* standard and that the sanction should be short of disbarment.

After our independent review of the record, we are convinced that respondent's medical evidence is insufficient to justify a lighter sanction. We acknowledge that respondent's condition makes this an atypical case. However, in other matters in which a respondent has proffered a medical condition or compulsion as a mitigating factor, we have concluded that disbarment is the appropriate disposition.

In other cases, we have been unconvinced that attorneys suffering from identifiable compulsive disorders, mental illness, or mental conditions could demonstrate "a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful." *Jacob, supra,* 95 *N.J.* at 137, 469 *A.2d* 498; *see, e.g.,* [*In re*] *Roth,* 140 *N.J.* [430,] 448, 658 *A.2d* 1264 [ (1995) ] (major depression); *In re Davis,* 127 *N.J.* 118, 130–32, 603 *A.2d* 12 (1992) (alcoholism); *In re Spina,* 121 *N.J.* 378, 390–91, 580 *A.2d* 262 (1990) (narcissistic personality disorder); *In re Steinhoff,* 114 *N.J.* 268, 273–74, 553 *A.2d* 1349 (1989) (drug dependency); *In re Nitti,* 110 *N.J.* 321, 325–26, 541 *A.2d* 217 (1988) (compulsive gambling); *Jacob, supra,* 95 *N.J.* at 136–38, 469 *A.2d* 498 (thyrotoxicosis). In those cases we have independently reviewed the record and determined that the "medical facts" presented did not provide a sufficient basis for "a legal excuse or justification" in mitigation of the respondents' acts of misappropriation. *Id.* at 137, 469 *A.2d* 498. This result is consonant with the Court's view, clearly

expressed in *Wilson*, that disbarment would "be almost invariable" in misappropriation cases.

[*In re Greenberg*, 155 *N.J.* 138, 150, 714 *A.2d* 243 (1998), *cert. denied*, —— *U.S.* ——, 119 *S.Ct.* 1807, 143 *L.Ed.*2d 1011 (1999).]

In one case, *In re Hein*, 104 *N.J.* 297, 516 *A.*2d 1105 (1986), the respondent asserted alcoholism as a mitigating factor to the charge of misappropriation. The respondent's expert described the effect of the dependency: "there is a disruption eventually of the normal critical thinking and in concern and judgment in his perception of daily living and in the accomplishment of skills in his particular profession." *Id.* at 303, 516 *A.*2d 1105. In ordering disbarment, we explained:

These psychological states are extremely difficult for us to resolve. We do not purport here to determine definitively the effect alcohol dependency can have upon the volitional state of an individual. We have only the legal standard to guide us. We wish that we knew more.

Until we know more, perhaps until science and society know more, we shall continue to disbar in these cases. We believe that to do less will inevitably erode the *Wilson* rule and the confidence of the public in the Bar and in this Court. We believe that public attitudes toward alcoholics and addicts have changed, that they are much more compassionate, and almost totally nonpunitive, and that the members of the public have recognized more and more that they are dealing more with a disease than with a crime. Nevertheless, we do not believe that that sympathy extends to the point of lowering the barriers to the protection we have attempted to give to that portion of the public who are clients, especially clients who entrust their money to lawyers.

[*Id.* at 303-04, 516 *A.*2d 1105.]

Similarly, in *In re Greenberg, supra*, 155 *N.J.* 138, 714 *A.*2d 243, in which respondent was charged with misappropriating monies from his law firm, it was asserted that the respondent suffered from major depression. One expert stated that respondent "did not have the requisite intent to steal from his law firm." *Id.* at 146, 714 *A.*2d 243. Another expert stated that the respondent "had no conscious awareness of his actions when he misappropriated [the] funds." *Id.* at 156, 714 *A.*2d 243. In concluding disbarment was the appropriate sanction, we stated:

Neither expert goes so far as to claim that respondent was out of touch with reality or, alternatively, that he did not know what he was doing when he committed multiple acts of misappropriation. Instead, [the respondent's experts] opine that respondent's acts of misappropriation were available to his consciousness for only

short periods of time—during and just after the acts took place—after which they were confined to his subconscious. Rather than supporting respondent's claim, this testimony indicates that respondent did understand what he was doing at the time he was doing it.

[*Id.* at 156–57, 714 *A.*2d 243.]

■ We are compelled to reach a similar conclusion regarding respondent's condition. Although Dr. Gross discussed at length the debilitating and overpowering effects of respondent's illnesses, he also acknowledged that "Mr. Tonzola may have been aware that the funds misappropriated were client funds and that the utilization of those funds in the manner he did was unauthorized...." Dr. Gross further acknowledged, as noted by the DRB, "if the measure of a person's sanity is the rudimentary ability to appreciate the nature of his or her actions and to be able to differentiate whether those actions are right or wrong, then Mr. Tonzola was not 'insane' during the relevant times in question." Those acknowledgments, coupled with the opinion of OAE's expert, lead us to conclude that, "[r]espondent's mental illness, however severe, did not deprive him of the knowledge that he was taking [his client's] funds, that the funds belonged to his [client], or that his [client] had not authorized the taking." *Id.* at 158–59, 714 *A.*2d 243.

The OAE's suggestions notwithstanding, the record does not clearly indicate that respondent continued his pattern of improprieties while being actively treated by Dr. Gross. At best, the record indicates some slight overlap: respondent first sought Dr. Gross's treatment sometime in April 1994; the forgery of Judge Simon's signature, the last significant act that formed the basis of the charges brought against respondent, occurred on or about May 2, 1994. Respondent committed the bulk of the offenses between July 1992 and April 1994. Thus, we decline to question the content or efficacy of the opinion expressed by Dr. Gross to respondent's partners.

However, the fact that Dr. Gross was not actively treating respondent during the period of misconduct raises a different point. That fact essentially places Dr. Gross's opinion on a par with that of the OAE's expert, Dr. Greenfield. Both opinions are

based on after-the-fact examinations of the patient; neither is based on extensive contact with respondent at the time the offenses were occurring. The evidence in the record, therefore, is controverted: two experts, on equal footing, have reached opposite conclusions as to the ultimate effect of respondent's condition.

Nor can we overlook the fact, as emphasized by Dr. Greenfield, that respondent was able to function properly and well in other settings and in respect of other client matters, despite his illnesses. Moreover, as noted, even respondent's expert has admitted that respondent may have been able to differentiate between right and wrong during the relevant time periods. Viewed within the context of the entire record, respondent's proofs are insufficient to satisfy the exacting standard of *Jacob*. We cannot conclude with confidence that respondent's mental condition influenced or motivated his criminal conduct to the point of excusing it.

█ We emphasize that this matter involves not only the crime of misappropriation, but also of forgery. The latter offense involved respondent's efforts in forging the signatures of three judges and producing phony court documents on assorted dates. Not only do such acts perpetrate a fraud against the client, they touch upon, indeed corrupt, the judicial process. Standing alone, those acts warrant stern discipline. *See In re Coruzzi*, 98 *N.J.* 77, 79, 484 *A.*2d 667 (1984).

## IV.

█ Respondent's fall is tragic, but no more so than the fate that has befallen other attorneys before him. We acknowledge that there is much we do not know about manic depressive behavior and bipolar disorders. As in the case of alcoholism, "[w]e wish that we knew more." *In re Hein, supra*, 104 *N.J.* at 303, 516 *A.*2d 1105. In the final analysis, the best we can do as judges is consider the quality of proofs and apply the law evenly to all parties similarly situated. We endeavor to do that today. As always, we also endeavor to maintain the public trust.

[M]aintenance of public confidence in this Court and in the bar as a whole requires the strictest discipline in misappropriation cases. That confidence is so important that mitigating factors will rarely override the requirement of disbarment. If public confidence is destroyed, the bench and bar will be crippled institutions.

Functioning properly, however, in the best traditions of each and with full public confidence, they are the very institutions most likely to develop required reform in the public interest.

[*In re Wilson, supra*, 81 *N.J.* at 461, 409 *A.2d* 1153.]

Respondent is disbarred. He is ordered to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

COLEMAN, J., concurring in part and dissenting in part.

I concur in the Court's judgment that respondent should be disbarred. I write separately to explain why the Court's prior order, requiring supplemental proceedings to determine whether respondent's manic depression or bipolar disorder should mitigate the quantum of discipline, was inappropriate in this case.

Respondent Tonzola pled guilty to theft by unlawful taking, contrary to *N.J.S.A.* 2C:20–3, and forging a judge's signature, contrary to *N.J.S.A.* 2C:21–1a(2). A person is guilty of theft of movable property by unlawful taking or disposition "if he [or she] unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him [or her] thereof." *N.J.S.A.* 2C:20–3. Respondent also purposely forged the signature of a Superior Court judge to a letter that falsely informed other counsel of the status of civil litigation related to the purchase of real estate by respondent's client.

When respondent entered his unconditional guilty pleas to theft and forgery, he admitted that his conduct was purposeful and that he was waiving any and all defenses to those offenses, including any mental defect such as diminished capacity. *See R.* 3:9–2. The guilty plea to purposely stealing $27,000 from a client satisfied the mental culpability requirement for a knowing misappropriation of client funds explicated in *In re Wilson*, 81 *N.J.* 451, 409 *A.2d* 1153 (1979). *See N.J.S.A.* 2C:2–2c(2). Respondent's criminal convictions, based on his guilty pleas, are "conclusive evidence of [his] guilt in disciplinary proceedings." *In re Goldberg*, 142 *N.J.* 557, 565, 666 *A.2d* 529 (1995).

Our Court Rules provide that once a respondent has been convicted of a criminal offense, whether by plea or verdict, and disciplinary proceedings are based on the criminal conduct, the

sole issue to be decided in the attorney disciplinary proceeding "shall be the extent of final discipline to be imposed." *R.* 1:20–13(c)(2). To mitigate the quantum of discipline, a respondent may present "evidence which does not dispute the crime but which shows mitigating circumstances [relevant to] the issue of whether the nature of the 'conviction merits discipline and, if so, the extent thereof.'" *In re Mischlich,* 60 *N.J.* 590, 593, 292 *A.*2d 23 (1972) (citation omitted). That principle has been codified in our Court Rules: "The Board and Court may consider any relevant evidence in mitigation that is *not* inconsistent with the essential elements of the criminal matter for which the attorney was convicted or has admitted guilt as determined by the statute defining the criminal matter." *R.* 1:20–13(c)(2) (emphasis added).

Notwithstanding that respondent's guilty plea and criminal conviction for knowing misappropriation of client funds triggered the *Wilson* automatic disbarment rule, he has attempted to prove in the mitigation proceeding that his manic depression/bipolar disorder prevented him from being able to formulate the requisite mental culpability for a knowing misappropriation of client funds. Respondent also contends that although he pled guilty to forgery, he suffered from a mental defect that prevented him from being able to purposely commit forgery. I reject both of those contentions as a matter of law. I am of the view that the supplemental hearing afforded respondent should not have been conducted and the outcome of those proceedings should have no impact on the quantum of discipline to be imposed. Although such a hearing was unwarranted, I am further persuaded that respondent's proofs failed to establish any entitlement to mitigation.

The supplemental proceedings were intended to afford respondent an opportunity to collaterally attack his criminal convictions. A quote from the report of Dr. Gross, who was retained as respondent's expert, illustrates this point:

... Mr. Tonzola's Manic Depression so impaired his will that his otherwise purposeful actions are excusable. And though Mr. Tonzola may have been aware that the funds misappropriated were client funds and that the utilization of those funds in the manner he did was unauthorized, his cognitive and cerebral processes concerning the nature, quality and, most significantly, consequences of those acts were totally impaired.

Respondent's reliance upon *In re Greenberg,* 155 *N.J.* 138, 714 *A.*2d 243 (1998), and *In re Jacob,* 95 *N.J.* 132, 469 *A.*2d 498 (1984), to support his mitigation claim, is misplaced. The relevant statement in *Jacob,* that competent medical proofs can demonstrate that a respondent has "suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful," *Id.* at 137, 469 *A.*2d 498, which was repeated in *Greenberg, supra,* 155 *N.J.* at 150, 714 *A.*2d 243, arose in the context of a respondent who had not been convicted of knowing misappropriation of client or law firm funds. Even in those cases, the Court did not find the respondents had met the *Jacob* burden. Additionally, the disciplinary proceedings in those cases were not based on *Rule* 1:20–13(c)(2), as in the present case. More on point are *In re Goldberg,* 109 *N.J.* 163, 536 *A.*2d 224 (1988), and *In re Gipson,* 103 *N.J.* 75, 510 *A.*2d 660 (1986), cases involving convictions for theft of client funds where the criminal convictions formed the basis for the disciplinary proceedings. There, too, the *Jacob* mitigation defense was rejected. Indeed, no decision of this Court ever afforded *Jacob*-type relief in a *Wilson* misappropriation case. The misappropriations involved in *In re Cornish,* 98 *N.J.* 500, 501, 511, 488 *A.*2d 551 (1985), predated the decision in *Wilson* and there was no criminal conviction for theft.

The inquiry contemplated by *Jacob* ordinarily is not warranted after a criminal conviction for theft of client or law firm funds that form the basis of disciplinary proceedings because of the *Wilson* automatic disbarment rule. The purpose of a mitigation inquiry is to "determine if circumstances exist that would justify [the Court] in concluding that the attorney had suffered such a loss of comprehension that 'he was unable to comprehend the nature of his act or lacked the capacity to form the requisite intent.'" *In re Steinhoff,* 114 *N.J.* 268, 272, 553 *A.*2d 1349 (1989) (citation omitted). A judgment of conviction forecloses further consideration of mental culpability for the offense for which a respondent stands convicted.

In a *Wilson*-type case, the purpose of the diminished capacity evidence in a *Jacob* proceeding is to show the loss of competency,

comprehension, or will. That is simply another way of attacking the essential mental culpability element of purposeful theft of client funds contrary to *Rule* 1:20–13(c)(2). *Jacob* and its progeny use a "M'Naghten-type" diminished capacity standard.[1] I prefer a bright-line rule holding that *Jacob* has no application when the disciplinary proceedings are based on a judgment of conviction for theft of client or law firm funds. The rule that I endorse adheres to the dictates of *Rule* 1:20–13(c)(2), disallowing mitigation evidence that is inconsistent with one or more of the essential elements of the offenses for which a respondent has been convicted. The requisite mental states for theft and forgery were conceded by respondent when he acknowledged that he purposely committed the offenses. Neither of his guilty pleas nor the judgment of convictions has been vacated. Consequently, I would invoke both judicial estoppel and quasi-estoppel to enforce *Rule* 1:20–13(c)(2), thereby preventing respondent from blowing both "hot and cold" by taking a position in the disciplinary proceedings that is inconsistent with his criminal convictions. In other words, I would simply enforce the Court's own *Rule* 1:20–13(c)(2). I empathize with respondent and his family's plight. But as the Disciplinary Review Board observed:

> [T]his matter arose by way of a motion for final discipline following respondent's guilty plea to forgery of a judge's signature and a theft of client funds by unlawfully taking. By virtue of the guilty plea, respondent admitted that his conduct was knowing and purposeful. To permit him now to argue that he lacked the requisite cognitive ability to commit those crimes would not only violate *R.* 1:20–13(c), but would also cause the public to question the integrity of the attorney disciplinary system and its goal of protecting the public. Rightfully, the public

---

[1] The English common-law M'Naghten Rule evolved as our insanity rule. *State v. White*, 27 *N.J.* 158, 164, 142 *A.2d* 65 (1958). That rule was essentially codified in the New Jersey Code of Criminal Justice (Code), that currently defines insanity as "laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong." *N.J.S.A.* 2C:4–1. The Code also recognizes that, although a person may not have been insane at the time he or she committed a criminal act, that individual may have a diminished-capacity defense. *N.J.S.A.* 2C:4–2. It is a defense that will either excuse conduct otherwise criminal, by negating the essential mental culpability element of an offense defined in *N.J.S.A.* 2C:2–2, or reduce the degree of the offense charged. *State v. Breakiron*, 108 *N.J.* 591, 603, 532 *A.2d* 199 (1987).

would be unable to reconcile one court's acceptance of respondent's guilty plea and the factual basis for it, with a subsequent finding in a disciplinary context by a separate court system that he lacked the requisite cognitive abilities to be held responsible for his actions and would, therefore, not be disbarred.

The record clearly and convincingly establishes that respondent knowingly misappropriated client funds, which triggers the *Wilson* automatic disbarment rule. He also poisoned the well of justice with the forgery. *In re Verdiramo*, 96 *N.J.* 183, 186, 475 *A.2d* 45 (1984). Hence, I join the Court's judgment to disbar respondent.

*For disbarment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*Concurring in part and dissenting in part*—Justice COLEMAN—1.

## ORDER

It is ORDERED that **JUDE J. TONZOLA** of **PARSIPPANY**, who was admitted to the bar of this State in 1986, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **JUDE J. TONZOLA** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that **JUDE J. TONZOLA** comply with *Rule* 1:20–20 dealing with disbarred attorneys; and it is further

ORDERED that **JUDE J. TONZOLA** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.