**The PEOPLE of the State of Colorado, Complainant,**

v.

**Jerrold C. KATZ, Respondent.**

**No. 00PDJ053.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Nov. 13, 2002.

As Amended Nov. 22, 2002.

Opinion by the Hearing Board consisting of the Presiding Disciplinary Judge ROGER L. KEITHLEY and Hearing Board members, BOSTON H. STANTON, JR. and THOMAS J. OVERTON both members of the bar.

## AMENDED OPINION AND ORDER IMPOSING SANCTIONS

*SANCTION IMPOSED: ATTORNEY DISBARRED*

The trial in this matter was held on September 9 through 13, 2002, before a Hearing Board consisting of the Presiding Disciplinary Judge Roger L. Keithley ("PDJ") and two hearing board members, Boston H. Stanton, Jr., and Thomas J. Overton, both members of the bar. Gregory G. Sapakoff, Assistant Regulation Counsel represented the People of the State of Colorado (the "People"). Gary S. Cohen represented the respondent, Jerrold C. Katz, ("Katz") who was also present.

The People's exhibits 1 through 13, 14 (admitted for limited purpose), 15 and 18 were offered and admitted into evidence. Katz's exhibits 101, 102, 103, 104, 105, 106, 108, 109, 110, 111, 112, 117, 118, 125, 128, 129 through 154, 157, 158, 159, 169, 171, 172, 173, 178, and 179 were offered and admitted into evidence. The Hearing Board heard testimony from the People's witnesses Jerrold Katz, Allan Molk, Charles Kercheval, Robin Beattie, Carmell Ryan, and John Salmon. In lieu of live testimony from David Wollins, a portion of Mr. Wollins' deposition transcript was read into the record by stipulation. The Hearing Board also heard testimony from Katz's witnesses Irving Johnson, Greg L. Perczak and Gary Gutterman, M.D. Katz testified on his own behalf. In lieu of having John Salmon testify as a witness in the respondent's case, the parties stipulated as to how Mr. Salmon would testify with respect to certain matters. The Hearing Board considered argument of counsel, assessed the credibility and testimony of the witnesses, the exhibits admitted, the stipulated statement of facts set forth in the Trial Management Order, and made the following findings of fact which were established by clear and convincing evidence.

## I. FINDINGS OF FACT

Jerrold Katz was licensed to practice law in the State of Massachusetts in 1964. He was licensed to practice law in the State of Colorado in 1984, attorney registration number 13966. Katz maintained a law practice in both Massachusetts and Colorado during all times relevant to the events in question.

From 1991 to 1996, Katz was in partnership with Susan L. Sanger in Colorado. In 1996 that partnership dissolved. In March of the following year, Katz contacted John Salmon ("Salmon") of Salmon, Lampert and Clor, P.C. ("SLC") to inquire whether he would be interested in collaborating on medical malpractice cases. Although Salmon agreed to a co-counseling arrangement, the specifics of the collaboration agreement were not reduced to writing. The specific nature of the collaboration arrangement is the subject of dispute. Although Katz has taken the position the business arrangement was a joint venture, Salmon describes it as only a co-counseling relationship for specific cases. The precise nature of the business relationship will be decided in a civil action pending in the Arapahoe County District Court, Case No. 99CV3206.

Following their agreement to participate jointly in the representation of clients, Salmon and Katz maintained separate malpractice

insurance policies, separate phones, and separate advertising. On cases generated by Katz in Colorado, SLC had the right to exercise the co-counsel arrangement or decline to co-counsel. If SLC declined to co-counsel on a given case, Katz could look elsewhere for co-counsel. On cases in which a co-counsel arrangement was undertaken, both firms filed entries of appearance on behalf of the client. The co-counsel cases were based on contingent fee agreements and Katz and SLC would recover attorneys' fees only if successful on the claims. On co-counseled cases, SLC would advance payment of costs and, upon successful conclusion of the representation and receipt of funds through judgment or settlement, SLC would recover the costs advanced and receive sixty percent of the attorney fees earned. Katz would receive forty percent of the attorney fees earned. As part of the arrangement, SLC would provide office space, support staff and the services of associate attorneys to work on the co-counseled cases. Settlement checks were to be deposited into the SLC trust account, and SLC would make distributions of funds consistent with the contingent fee agreement and the co-counsel arrangement.

In March 1997, Katz moved into the SLC offices. Katz continued to practice under the name "Katz and Associates," continued to employ two associates in his Massachusetts office, maintained a full-page advertisement in the Denver Yellow Pages referring to "Katz and Associates," maintained "Katz and Associates" letterhead, and continued to maintain liability insurance, a bank account, and filed tax returns for "Katz and Associates."

One of the cases subject to the co-counseling agreement concerned a medical malpractice action brought by Deanna L. Groves ("Groves"). Groves retained Katz and Associates and SLC to represent her pursuant to a contingent fee agreement signed March 11, 1998. Salmon executed the Groves contingent fee agreement on behalf of both Katz and Associates and SLC. In the Groves case, both firms were listed as counsel of record on the pleadings.

From the outset of the business relationship, disagreements arose between Katz and Salmon. Katz demanded the business relationship be reduced to writing. Salmon questioned the need for costs expended by Katz. Katz questioned the amount of staff support provided for the co-counsel cases and Salmon questioned the amount of time Katz was spending on the cases while maintaining his Massachusetts practice.

By mid 1998, the working relationship between Katz and Salmon had become acrimonious. On August 6, 1998, Salmon notified Katz that their business arrangement was not working out, and provided notice requiring Katz to vacate the SLC offices within thirty days. As a result, Katz moved out of the SLC offices in September 1998, and began renting space from David Wollins ("Wollins") of Wollins, Hellman and Green, PC in Denver.

By letter dated September 25, 1998, Salmon and Katz notified Groves that SLC and Katz and Associates would no longer act as co-counsel on her case. The letter informed her that she must decide which firm should continue to represent her. She chose Katz and Associates.

The Groves medical malpractice matter went to trial in December 1998. Notwithstanding their dispute, Salmon and Katz determined that both Katz and two associate lawyers from SLC, Brian Lampert and Victoria Tucker, should participate in the trial. During jury deliberations, the matter settled for $500,000. Pursuant to that settlement, on December 22, 1998, a settlement check was issued in the amount of $500,000 and made payable to Groves, SLC and Katz and Associates.

By that time, the relationship between Salmon and Katz had further deteriorated and they both harbored mistrust of the other. The mistrust was of sufficient magnitude that they could not agree upon the trust account into which the settlement check should be deposited. Salmon insisted it be deposited into the SLC account consistent with the co-counseling agreement, and Katz demanded it

be deposited into his trust account consistent with the client's request. Katz retained Alan Molk ("Molk") and Salmon retained Robin Beattie ("Beattie") to represent their respective interests in connection with their disagreements including the distribution of the Groves settlement proceeds. Initially, their attorneys attempted to resolve all of the Katz/Salmon disagreements in conjunction with the Groves settlement. By early January, it became apparent that resolution of the entire disagreement would not be promptly forthcoming and negotiations focused upon the distribution of the Groves settlement proceeds. By January 11, 1999, Katz and Salmon had agreed, through counsel, to deposit the $500,000 settlement check into a joint COLTAF account from which funds could be withdrawn only upon the signature of both Salmon and Katz, and that the portion of the settlement payable to Groves, $200,000, would be immediately disbursed to her.

On January 12, 1999, Salmon, Beattie, and Groves met Charles Kercheval, the senior vice president of First Bank at First Bank of the Denver Tech Center. Katz arrived shortly thereafter without his attorney.[1] Mr. Kercheval informed the parties that his bank could not open a COLTAF account which required two signatures but the bank would be willing to open a joint account requiring two signatures on all checks in excess of $10,000. During those discussions, Beattie informed Katz that notwithstanding the account's $10,000 limitation on signatures, Salmon would agree that no checks would be drawn on the account without both Salmon and Katz's authorization. Beattie stated that in order to insure no funds were removed absent such joint authorization, she would retain custody of all checks and bank statements. Katz agreed with that arrangement. Immediately thereafter, a joint account was opened requiring two signatures for withdrawals with only Katz and Salmon as authorized signatories.

The bank took possession of the $500,000 settlement check and issued a cashier's check to Groves in the amount of $200,000. The bank deposited the balance of the proceeds from the Groves settlement check, $300,000, into the joint account. From the time of the settlement through the date the joint account was opened, both Salmon and Katz were aware that there were numerous third parties who asserted claims against the remaining settlement funds, including both Salmon and Katz for costs advanced.

Throughout January 1999, Salmon and Katz's attorneys attempted to resolve disputes over disbursement of the remaining $300,000 without success. Because the dispute could not be resolved, Katz's financial condition became strained.

On February 1, 1999, Katz's new office landlord, Wollins, demanded that Katz pay past-due rent for December, January, and the current rent for February. Katz told Wollins that although he had settled a case with Salmon, he had not yet obtained his portion of the fees and could not pay the rent. Wollins was aware Katz had a dispute with Salmon but he did not know the specifics. During their discussion, Katz advised Wollins that a joint checking account had been opened into which the settlement proceeds had been deposited, that checks on that account in excess of $10,000 required both his and Salmon's signature, that he and Salmon had a joint venture to represent the client and that they could not agree on how to split the attorney fees from the settlement funds in light of their other disputes. Katz also told Wollins the account was not a trust account and there was no agreement regarding the writing of checks on the account.

At some point during the discussion, Wollins told Katz that given the facts Katz had presented, Katz would not be prohibited from writing checks for less than $10,000 on the account. Although Wollins described this conversation as "brainstorming," Katz characterized it as legal advice. Katz perceived the statement by Wollins to be a "legal loophole" that could "level the playing field" in his dispute with Salmon.

**1.** Katz's attorney, Molk, had previously agreed that Katz could attend the meeting without him.

Katz immediately went to First Bank and obtained counterchecks for the joint account. He informed neither Salmon, Beattie, nor his own attorney, Molk, that he had obtained the counterchecks. On February 2, 1999, without Salmon, Beattie or Molk's knowledge, Katz wrote four counterchecks drawn on the joint account at First Bank, one payable to his office landlord, Wollins, and three payable to himself, each in the amount of $9,500 for a total of $38,000. Katz tendered payment for rent to Wollins using the first check written on the joint account. Wollins endorsed and cashed the check. Katz deposited the funds derived from the remaining three checks into his personal account. On the same day, Katz told Carmel Ryan, his former paralegal, that he had taken money out of an unspecified account and had "screwed Salmon" and that "there was nothing he could do about it."

On February 3, 1999, Molk, on Katz's behalf, rejected Salmon's latest offer to resolve the dispute. At that time, Molk was unaware of Katz's issuance of the checks. The same day, Katz terminated Molk's representation and engaged Wollins to represent him in the dispute. Katz disclosed to Wollins that the total amount of attorney's fees from the Groves settlement after all third party claims and costs advanced by Salmon were paid would be approximately $140,000. Application of the co-counseling agreement would result in Katz being entitled to forty percent of that amount or $56,000, plus costs he had advanced in the Groves matter in the amount of $3,382.25 for a total of $59,382.25. In addition to the Groves settlement, Katz believed he was entitled to an additional $8,000 from Salmon arising out of the settlement of another matter, the Phofsky case, which Katz understood had settled in mid–1998.

The next day, February 3, 1999, without Salmon's knowledge, Katz wrote five more counterchecks drawn on the joint account at First Bank, all payable to himself and each in the amount of $9,716 for a total of $48,580.[2] During the two-day period of February 2 and 3, 1999, Katz wrote checks and received funds from the joint account totaling $86,580.

On February 4, 1999, Beattie spoke to both Wollins and Katz. Katz requested that the third parties be paid who were still owed funds from the Groves settlement. Wollins and Katz expressed the view that it was permissible to write checks under $10,000 from the joint account if signed by either Salmon or Katz. Beattie reminded them that issuance of any check signed only by Katz or Salmon was counter to the agreement regarding the joint account. Katz did not reveal that he had already withdrawn funds from the account.

For the next two days, Beattie continued to negotiate with Wollins regarding disbursement of the $300,000 she believed to still be in the joint account. During that time, Katz wrote six additional checks, all less than $10,000, totaling $56,500 on the joint account, each payable to the United States Treasury. Katz intended to satisfy his personal tax liability with those funds.

On Saturday, February 6, 1999, Charles Kercheval, the First Bank officer who had assisted in opening the joint account, noticed the withdrawals on the account and notified Salmon. Not wanting to expose the bank to a dispute over the funds, Kercheval closed the account and issued a cashier's check to Salmon and Katz for the funds still remaining in the account. The last six checks Katz made payable to the United States Treasury did not clear the account.

Katz succeeded in withdrawing $86,580 of the Groves settlement funds held in the joint account and exercised exclusive dominion and control over those funds. At least $9,500 of the funds was used to satisfy a personal obligation. The $86,580 exceeded Katz's own estimate of his maximum entitlement to the

2. Apart from writing the checks in increments of less than $10,000, Katz could not explain why the checks were drawn in the amount of $9,716.

Groves settlement funds by $27,197.75.[3] Katz attempted to withdraw an additional $56,500 of the settlement funds and intended to utilize those funds for the payment of personal taxes. In total, Katz withdrew or attempted to withdraw $143,080 from the joint account. At all times, Katz knew that his entitlement to any portion of those funds was in dispute. On February 6, 1999, having learned from Salmon that Katz had written counterchecks on the joint account, Beattie demanded that Wollins inform Katz that he must immediately return the funds.

Katz terminated Wollins as his attorney on February 8, 2002, and hired Steven Kuehl to negotiate a settlement with Salmon. By February 16, Kuehl succeeded in negotiating a settlement of the dispute over the distribution of the Groves settlement funds remaining in the joint account, and as part of that resolution, Katz returned the funds he had taken. Wollins also returned the funds tendered to him for Katz's office space rental. Katz ultimately received a total of $57,396.45 pursuant to the February 16 settlement with Salmon from the Groves funds. The remaining funds were distributed to SLC, lienholders and third parties.

All of the funds Katz succeeded in drawing from the joint account at First Bank were either utilized by Katz for his own purposes or were deposited by Katz into his personal account. None of the funds Katz drew from the joint account were held separate from Katz's own property.

Katz testified during the course of the trial that he did not recall any agreement preventing him from writing checks for less than $10,000 from the joint account, that he did not recall Beattie's conversations concerning that matter, and that it never occurred to him until it was later brought to his attention that he could not withdraw funds from the account. That testimony, in light of the development of the dispute, its intensity, and the ongoing detailed negotiations, is not credible.

As the relationship between Salmon and Katz deteriorated, Katz's financial and personal condition also deteriorated. In addition to the distress in his life occasioned by the dispute with Salmon, additional distress arose when Katz's father died in August 1998 and Katz separated from his wife in September of that year. In the fall of 1998, Katz began psychological counseling.

Gary Gutterman, M.D., a psychiatrist qualified under CRE 702 to express opinions, both treated and evaluated Katz. The treatment and evaluation of Katz were based upon facts entirely self-reported by Katz. In January and February 1999, Katz suffered from a depressive disorder resulting in lack of sleep and agitation. In pre-trial proceedings, Dr. Gutterman diagnosed Katz's condition as mild depression. At trial, Dr. Gutterman modified his diagnosis and opined that Katz was suffering from anxiety and acute depression. Although he confirmed that depression does not usually cause people to act dishonestly, Dr. Gutterman testified that Katz's mental disorder "caused" him to write the checks on the joint account at First Bank. Notwithstanding that opinion, Dr. Gutterman further opined that Katz was aware of what he was doing and knew that entitlement to the funds was in dispute at the time he withdrew funds from the joint account. Dr. Gutterman determined that Katz was aware he was writing the checks and that Katz understood the funds belonged to both him and to Salmon, but that he had found a "legal loophole." Cross-examination revealed that Katz had not fully self-reported facts which Dr. Gutterman acknowledged were important to his evaluation. Specifically, Katz did not inform Dr. Gutterman that at the time of the events, Katz owed substantial back taxes, and that his financial condition was so severe that he was unable to pay his office rent. Dr. Gutterman opined that Katz's depressive disorder has abated.

Katz voiced remorse for what he had brought upon himself and the legal profes-

---

**3.** $86,580, the amount Katz succeeded in withdrawing, less $59,382.25, the maximum amount he believed he was entitled to for costs and fees from the Groves matter, results in an excess figure of $27,197.75.

sion, but specifically denied any remorse for the impact his actions had on Salmon.

## II. CONCLUSIONS OF LAW

The People's Amended Complaint charges Katz with the following violations of The Colorado Rules of Professional Conduct ("Colo.RPC"): claim one, Colo. RPC 1.15(a)(in connection with a representation, an attorney shall hold property of clients or third persons that is in the attorney's possession separate from the attorney's own property); claim two, Colo. RPC 1.15(c)(in the course of a representation, an attorney shall keep separate property in the attorney's possession in which both the attorney and another person claim interests until there is an accounting and severance of their interests); claim three, Colo. RPC 8.4(c)(it is professional misconduct to engage in conduct involving dishonesty, fraud, deceit or misrepresentation); claim four, Colo. RPC 8.4(c)(knowing conversion), and claim five, Colo. RPC 8.4(a)(it is professional misconduct for an attorney to violate or attempt to violate the rules of professional conduct).[4]

### The "Joint Venture/Partnership Defense" to All Claims

■ Katz asserts that his withdrawal or attempted withdrawal of funds from the joint account was proper, allowed and justified under applicable substantive Colorado partnership/joint venture law. See § 7–60–101 et seq., 2 C.R.S. (2001). Katz asserts that since the business arrangement between himself and Salmon was a partnership, he was enti-tled to an undivided interest in the joint account and, by virtue of Colorado law, could not convert property to which he held an undivided interest, relying on Hooper v. Yoder, 737 P.2d 852 (Colo.1987); People v. Clayton, 728 P.2d 723 (Colo.1986); Byron v. York Investment Co., 133 Colo. 418, 296 P.2d 742 (1956); Roberts v. Roberts, 118 Colo. 524, 198 P.2d 453 (1948); In re Johnson, 133 Ill.2d 516, 142 Ill.Dec. 112, 552 N.E.2d 703 (Ill.1989); Grimes v. Toensing, 200 Minn. 321, 273 N.W. 816 (Minn.1937), and Pierce v. Caldwell, 179 Iowa 868, 162 N.W. 8 (Iowa 1917). Katz further asserts that if the conduct is not proscribed by general principles of law, he should not be subject to discipline under the Rules of Professional Conduct for engaging in acts not otherwise prohibited.

Katz's reliance upon general principles of Colorado partnership law is misplaced.[5] Katz's construction of the business relationship between himself and Salmon as a joint venture or partnership and the discovery of a "legal loophole" did not relieve Katz of the responsibility to conform his conduct to the applicable Rules of Professional Conduct. See I. Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering, (3d. Ed.2002 Supp.) § 19.7 (providing that "when there is a dispute as to what share a lawyer is to receive from trust funds being held by the lawyer, whether the dispute is with a client or a third party, the lawyer must not take advantage of his physical control of the funds" ... "[i]nstead, he must disburse the undisputed share, as required by Rule 1.15(b), and keep safely segregated the remainder under Rule 1.15(c), until the dispute is resolved").

---

4. Claim six of the Amended Complaint alleges that Katz's withdrawal of funds is a breach of trust and therefore a violation of Colo. RPC 8.4(h)(it is professional misconduct for an attorney to engage in any other conduct that reflects adversely on the attorney's fitness to practice law). Claim six is pled in the alternative to the prior five claims. By virtue of the findings and conclusions reached herein, it is not necessary to decide the partnership/joint venture issue and accordingly claim six is dismissed.

5. Moreover, Katz presented no authority which would condone his unilateral removal of the funds from the joint account. Cf. Hooper, 737 P.2d at 859(holding that partners in a business enterprise owe to one another the highest duty of loyalty; they stand in a relationship of trust and confidence to each other and are bound by standards of good conduct and square dealing); Lindsay v. Marcus, 137 Colo. 336, 342–43, 325 P.2d 267, 270–71 (1958)(involving joint venturers; fiduciary duties are the same as those among partners); Schoeller v. Schoeller, 497 S.W.2d 860, 868 (Mo.App.1973)(during the period of continuance of partnership business following its dissolution, partners continue to occupy the position of fiduciaries).

■ An individual who becomes licensed to practice law must accept the burdens that flow with the acceptance of that license along with the benefits it may confer. One of the burdens imposed upon all licensed attorneys is to conform their professional conduct to the requirements of the Rules of Professional Conduct. Indeed, every attorney licensed to practice law must take an oath that they will do so.[6]

■ Conformity to the mandates of the Rules of Professional Conduct is required in addition to an attorney's adherence to other applicable law. Thus, though general principles of law might allow an individual to engage in certain acts, if the conduct is prohibited by the Rules of Professional Conduct, a licensed attorney providing services authorized by that licensure may not undertake such acts. Accordingly, Katz's conduct must be examined under the charged violations of the Rules of Professional Conduct and not under general principles of partnership law that may otherwise apply.

The Supreme Court of New Jersey, in a disciplinary case, *In the Matter of Joel Greenberg*, 155 N.J. 138, 714 A.2d 243, 252 (1997), resulting in the disbarment of an attorney for knowing misappropriation of law firm funds, addressed a similar defense advanced by the respondent attorney that as a partner, he was entitled to the funds:

> The [Rules of Professional Conduct] serve as a road map for the conduct of attorneys to guide them in their relationships with their clients, other attorneys, the courts, and the public. The relationship of attorneys to one another is also subject to the Court's disciplinary oversight. Lawyers who join together to practice, as a partnership or professional corporation, convey a "message" to the public. *In re Weiss, Healey & Rea*, 109 N.J. 246, 252–52, 536 A.2d 266 (1988). Such partnership implies

the full financial and professional responsibility of a law firm that has pooled its resources of intellect and capital to serve a general clientele .... The public, we believe, infers that the collective professional, ethical, and financial responsibility of a partnership-in-fact bespeaks the "kind and caliber of legal services rendered." (citation and footnote omitted).

Lawyers who practice together are bound by those strictures generally applicable to individual lawyers and by rules specifically applicable to law firms. Underlying each of the Rules that affect law firm organization and the representation of clients by lawyers practicing together is the interest in protecting clients, past, present, and prospective, and concern about the public perception of the bar. Law firms are the vehicles through which clients retain individual attorneys and the cultures in which those individual attorneys function once retained. Lawyers who betray their partners betray that trust.

Most important, the Court has recognized "no ethical distinction between a lawyer who for personal gain willfully defrauds a client and one who for the same untoward purpose defrauds his or her partners." *In re Siegel*, 133 N.J. 162, 167, 627 A.2d 156 (1993). Our perception that such acts of theft are morally equivalent does not derive from the relationships between attorneys and their clients or attorneys and their partners but, rather, from our belief that "misappropriation from the latter is as wrong as from the former." *Id.* at 170 [627 A.2d 156]. Moreover, it is not clear that a distinction between client funds and firm funds is readily made by the average person. The general public is unlikely to know that attorneys are required to maintain separate accounts for client and firm funds, RPC 1.15, and may fear that the misappropriation of firm funds is synony-

---

**6.** At the time Katz took the oath, the Code of Professional Responsibility contained the applicable rules of conduct. In 1993, the Code of Professional Responsibility was replaced by the Rules of Professional Conduct. From time to time, the specific provisions of both the Code of Professional Responsibility and the Rules of Professional Conduct have been modified. It is the duty and responsibility of every licensed attorney to remain informed of the applicable rules of conduct and conform his or her conduct to the dictates of the current rules.

mous with the misappropriation of client funds. It is this threat to public confidence in the integrity and trustworthiness of the bar that motivated the Court in [*In Re*] *Wilson*, [81 N.J. 451, 409 A.2d 1153 (1979)] [to state the rule] ... "[i]n the absence of compelling mitigating factors justifying a lesser sanction, which will occur quite rarely, misappropriation of firm funds will warrant disbarment."

Consequently, whether general principles of partnership law would allow Katz to withdraw the funds is not relevant to our analysis and it is not necessary for purposes of reaching a decision in this disciplinary case to find or conclude that the co-counsel arrangement was or was not a joint venture or partnership and no such determination is made.

### The "Advice of Counsel Defense" to All Claims

■ Although Katz did not list advice of counsel as a defense in his Amended Answer, during the course of trial Katz argued that his actions relied upon the advice of his attorney, David Wollins, who confirmed that he could withdraw funds from the joint account under the general principles of partnership law. Katz asserted that because he was given legal advice by Wollins stating that, as a joint venturer, he could write checks and utilize funds from the joint account, he cannot be held to have violated the Rules of Professional Conduct. This decision rejects that argument on two separate grounds. First, it is presumed that Katz—as an attorney himself—understands and will adhere to the Rules of Professional Conduct. *See In the Matter of Attorney C*, 47 P.3d 1167, 1173, n. 12 (Colo.2002)(holding that all attorneys in Colorado are presumed to be aware of the rules and their import). It is the individual attorney's duty and obligation to comply with the Rules of Professional Conduct. The attorney may not delegate that duty or responsibility to another under the umbrella of advice of counsel and thereby create a defense to a violation of those Rules. Second, the facts of this case established that Katz withheld material information from

Wollins during the discussion in which Katz contends the legal advice was provided. Absent full, fair and honest disclosure of all known relevant information concerning the issue, the advice of counsel defense is not available. *Wyatt v. Burdette*, 43 Colo. 208, 95 P. 336, 339 (Colo.1908)(holding that where the defense of advice of counsel is relied upon, it is absolutely essential that the defendant disclose by his testimony the facts which he communicated to counsel, so that the jury may determine whether or not the defendant made a full, fair, and honest statement to counsel).

### Claim One: Colo. RPC 1.15(a)

■ Claim one of the Amended Complaint alleges that Katz's conduct violated Colo. RPC 1.15(a) which provides, in part:

> In connection with a representation, an attorney shall hold property of clients or third persons that is in an attorney's possession separate from the attorney's own property. Funds shall be kept in a separate account maintained in the state where the attorney's office is situated, or elsewhere with the consent of the client or third person.

Rule 1.15(a) requires a lawyer to hold property to which clients or third parties assert an interest separate from the lawyer's own property. The duty to do so is similar to the duty required of a fiduciary. *See Comment* to Colo. RPC 1.15 (providing that a lawyer "should hold property of others with the care required of a professional fiduciary"). The Rule amounts to "an absolute ban on commingling [property belonging to others] with the lawyer's own property." Hazard and Hodes, *supra*, § 19.2.

The Groves settlement proceeds were initially placed in a separate account pending resolution of the dispute between Katz and Salmon. As proceeds of the Groves litigation, they came within the scope of Colo. RPC 1.15(a) as property held by an attorney "in connection with a representation." The dispute over distribution of those funds does not alter the fact that possession and control

of the funds arose in connection with a representation. Indeed, at the time Katz wrote the checks, the representation of Groves was not yet complete.[7]

It is undisputed that Katz knew at the time he withdrew funds from the joint account that third persons—lienholders, medical providers, SLC and other creditors—claimed some portion of those funds. The exact amounts claimed were in dispute and the subject of active negotiations. Katz asserts, however, that the amount of funds he withdrew and attempted to withdraw was less than the maximum amount owed to third parties other than SLC. That contention fails to recognize that, as to Katz, SLC is a third person for purposes of Colo. RPC 1.15(a) and entitled to the same protections as other persons claiming an interest in the funds. *See People v. Egbune*, (Colo. PDJ 1999), 58 P.3d 1168, 1173, (holding that lawyer violated Colo. RPC 1.15(a) and Colo. RPC 1.15(c) by disbursing the full measure of attorney fees earned from settlement of a civil action to himself, despite his knowledge that his predecessor counsel claimed an interest in any fee earned from the settlement). At the time Katz wrote the checks, no agreement had been reached between Katz and Salmon regarding resolution of their dispute. Consequently, under the provisions of Colo. RPC 1.15(a), when Katz received the funds derived from the checks, he was required to keep those funds separate from his own property. He failed to do so and violated Colo. RPC 1.15(a).

### Claim Two: Colo. RPC 1.15(c)

■ Claim two of the Amended Complaint alleges that Katz's conduct violated Colo. RPC 1.15(c), which provides:

When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

Katz's joint signature authority over the joint account in which the Groves settlement funds were deposited satisfies the possession requirement of Colo. RPC 1.15(c). The funds in the joint account arose from the settlement of the Groves matter, were received in the course of representation and, therefore, come within the scope of the Rule. *See People v. Gray*, 35 P.3d 611, 621 (Colo. PDJ 2001)(holding that Colo. RPC 1.15(c) "applies to property of any kind in the possession of the attorney over which two or more entities claim an interest, regardless of whether the client is one of the claimants or is not"). *See, e.g., In the Matter of Cleland*, 2 P.3d 700, 701 (Colo.2000)(attorney disbarred for using funds which were claimed by both the attorney and his client, without the client's authorization and before the resolution of the attorney's claim to payment for additional legal services); *Egbune, supra*, 58 P.3d 1168, (holding that because the respondent attorney was on notice of a prior attorney's claimed interest, at a minimum the respondent attorney was required to segregate and keep separate such proceeds from his own funds until the dispute over the funds was resolved). Katz had a duty to keep the funds separate until an accounting had been finalized and the third party interests to those funds had been severed. Katz's withdrawal of the $86,580 was effected prior to an accounting and severance of the third party interests.

Katz asserts that fees were due him from various other matters he and Salmon han-

---

7. Both parties to this disciplinary case advanced arguments premised upon the assumption that the attorney fees embedded within the $300,000 deposited to the joint account were "earned" for purposes of this case. It is not at all clear that the attorney fees were earned at the time Katz issued the fifteen checks. Under the terms of the contingent fee agreement, substantial additional work remained to be performed to negotiate resolution of the third party claims and liens (nearly $98,000) before the representation was concluded. Because that issue was not addressed by the parties, it will not be considered in this decision.

dled. The evidence presented established that the Phofsky matter was the only case which had settled as of February 2, 1999, the date Katz accessed and utilized the funds from the joint account. Katz might have recovered approximately $8,000 in fees from the Phofsky matter. There was no evidence, however, that the Phofsky funds were deposited in the joint account at First Bank with the Groves settlement proceeds. Accordingly, the Phofsky settlement was separate and apart from the Groves funds and cannot be included in the amounts due Katz from the joint account.

 Katz knew that the allocation of the funds held in the joint account was disputed and, therefore, had an affirmative obligation to keep the funds separate from his own until the dispute was resolved under Colo. RPC 1.15(c). *See* Hazard and Hodes, *supra* at § 19.7 (stating where there is a dispute as to what share a lawyer is to receive from funds being held by the lawyer, the lawyer must disburse the undisputed share and keep the remainder segregated until the dispute is resolved). Having failed to keep the disputed funds separate until an accounting and severance, Katz's conduct violated Colo. RPC 1.15(c).

**Claims Three and Four: Colo. RPC 8.4(c)**

**(dishonesty, fraud, deceit or misrepresentation and conversion)**

*A. Claim Three: Colo. RPC 8.4(c)(dishonesty, fraud, deceit or misrepresentation)*

 Claim three of the Amended Complaint alleges that Katz engaged in dishonesty and/or deceit by drawing funds from the joint account at First Bank without the knowledge or consent of SLC in violation of Colo. RPC 8.4(c). Colo. RPC 8.4(c) provides that "[i]t is professional misconduct to engage in conduct involving dishonesty, deceit,

fraud or misrepresentation." The charges in this case rely upon dishonesty and/or deceit.

Dishonesty has not been defined by the Colorado Supreme Court in connection with the Colorado Rules of Professional Conduct. Looking to other jurisdictions, the District of Columbia Court of Appeals, in a disciplinary matter, *In the Matter of Shorter,* 570 A.2d 760 (D.C.App.1990), stated:

> The most general term in DR 1–102(A)(4) [8] is "dishonesty," which encompasses fraudulent, deceitful, or misrepresentative behavior. In addition to these, however, it encompasses conduct evincing "a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness ..." Thus, what may not legally be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty.

*Id.* at 767–768.

At the time Katz withdrew and attempted to withdraw the funds and use them for his own benefit, he knew there was a dispute between himself and SLC with regard to the funds held in the joint account. Less than one month before withdrawing the funds, Katz engaged two different attorneys to represent him in the fee dispute, spoke directly to Salmon's attorney disputing the allocation of fees and the payment to third parties, was present at the bank when the joint account was opened, agreed that Beattie, Salmon's attorney, would take possession of the checkbook, and was aware that no funds would be withdrawn from the joint account until the dispute was resolved.

The means by which Katz accessed the funds demonstrates a "lack of fairness and straightforwardness." Katz consciously undertook efforts to conceal his withdrawal of funds from Salmon, Beattie and his own attorney, Molk. He didn't use the checks issued when the account was opened because those checks were protectively held by Beattie. Rather, he used counterchecks knowing access to the account checkbook was controlled

---

**8.** DR 1–102(A)(4) of the Model Code of Professional Responsibility was the precursor to Rule 8.4(c) and contains identical language to the current Rule.

by Beattie. Moreover, he repeatedly drew checks in amounts below the threshold amount, aware that writing them over that amount would trigger the bank to inquire regarding his authority. Katz's actions demonstrate a "lack of honesty, probity or integrity in principle."

■■■ *Shorter, supra,* further defines "deceit" as a subcategory of fraud, and as "the suppression of a fact by one who is bound to disclose it, or who gives information or other facts which are likely to mislead for want of communication of that fact." The joint account was opened with the understanding that no funds would be withdrawn unless both Salmon and Katz agreed. Implicit within that agreement was the assumption that both Salmon and Katz would know when there would be an agreement to withdraw funds. Katz knew Salmon would not agree to his intended withdrawals. The repeated offers, counteroffers and rejections passing between counsel negotiating settlement of the dispute confirm that fact. By writing checks on the account and utilizing the funds for his own purposes without disclosing his actions to Salmon or Beattie, Katz engaged in the "suppression of fact by one who is bound to disclose it." In *Egbune,* 58 P.3d 1168, the respondent attorney violated Colo. RPC 8.4(c) by engaging in deceit and misrepresentation, despite the lack of evidence of any affirmative misstatement of fact by the lawyer. *Egbune* held:

> [The respondent attorney's] receipt and disbursement of the settlement funds while on notice of [the prior attorney's] claimed interest, coupled with [the respondent attorney's] failure to disclose information to [the prior attorney], also constituted a violation of Colo. RPC 8.4(c)(a lawyer shall not engage in dishonesty, misrepresentation, deceit or fraud). Although silence alone does not normally constitute deceit or misrepresentation, under the circumstances of this case, Egbune had an affirmative obligation under Colo. RPC 1.15(b) to provide an accounting. His failure to do so and thereafter stand mute in the face of

several inquiries by [the prior attorney] rises to the level of deceit and misrepresentation.

*Id.* at 1173; *citing People v. Harding,* 967 P.2d 153, 154 (Colo.1998)(respondent stipulating to a violation of Colo. RPC 8.4(c) by failing to hold in trust and segregate disputed third party funds); *People v. Campbell,* 932 P.2d 312, 313 (Colo.1997)(respondent stipulating to fact that he engaged in misrepresentation by failing to inform a provider of the amount of settlement and pay him the agreed-upon amount out of the proceeds); *People v. Robertson,* 908 P.2d 96, 99 (Colo.1995)(holding that attorney's failure to pay full amount owed to client's treatment clinic after he received funds in trust violated Colo. RPC 8.4(c)). Pursuant to *Egbune, supra,* a violation of Colo. RPC 8.4(c) can be predicated upon either an act or an omission. Katz's conduct involved a combination of acts and omissions. The surreptitious withdrawal of funds from the joint account at First Bank amounted to a series of dishonest and deceitful acts. Katz's conduct violated Colo. RPC 8.4(c) as alleged in claim three.

### B. Claim Four: Colo. RPC 8.4(c)(Knowing Conversion)

■■■ Claim four of the Amended Complaint alleges that Katz's withdrawal of the funds from the joint account constituted knowing conversion in violation of Colo. RPC 8.4(c). Conversion is defined in *People v. Varallo,* 913 P.2d 1 (Colo.1996) as follows:

> Knowing misappropriation [for which the lawyer is almost invariably disbarred] "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan,* 102 N.J. 157, 160, 506 A.2d 722 (1986). Misappropriation includes "not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson,* 81 N.J. 451, 455 n. 1, 409 A.2d

1153 (1979). The motive of the lawyer is irrelevant in determining the appropriate discipline for knowing misappropriation.

Moreover, "[i]ntent to deprive permanently a client of misappropriated funds, however, is not an element of knowing misappropriation." *In re Barlow,* 140 N.J. 191, 657 A.2d 1197, 1201 (1995).[9]

A "technical conversion," usually warranting suspension rather than disbarment, is a conversion or misappropriation where the complainant either concedes that the misappropriation was negligent, *People v. Dickinson,* 903 P.2d 1132, 1138 (Colo.1995), or it cannot be proven by clear and convincing evidence that the respondent knowingly converted the funds, *People v. Galindo,* 884 P.2d 1109, 1112 (Colo.1994) (board's conclusion that conversion was negligent rather than knowing was supported by the record and would not be overturned); *People v. Wechsler,* 854 P.2d 217, 220–21 (Colo.1993) (supreme court will not overturn hearing board's conclusion that intentional conversion was not established by clear and convincing evidence unless there is no substantial evidence in the record to support conclusion); *People v. McGrath,* 780 P.2d 492, 493 (Colo.1989)("Indeed, if there were not some lingering doubt about whether the respondent engaged in knowing conversion of his client's funds, we would have no hesitation in entering an order of disbarment").

*Varallo,* 913 P.2d at 10–11.

■ In Colorado, misappropriating funds belonging to a third party is no less egregious than using funds belonging to clients. In *People v. Guyerson,* 898 P.2d 1062 (Colo. 1995) the Supreme Court disbarred a lawyer for converting funds from a law firm in which

he was a partner, including some funds that belonged to clients. In considering the lawyer's argument that he did not intend to take any client funds, the Court in *Guyerson* stated:

> Even if the respondent had been entirely successful in stealing only from his law firm and from his partners, we would not find it particularly significant for disciplinary purposes. The respondent did intend to steal from his partners. *Cf. Hooper v. Yoder,* 737 P.2d 852, 859 (Colo.1987)("Partners in a business enterprise owe to one another the highest duty of loyalty; they stand in a relationship of trust and confidence to each other and are bound by standards of good conduct and square dealing."); *People v. Sachs,* 732 P.2d 633, 634 (Colo.1987)(although not acting as a lawyer for the partnership, the lawyer-respondent in a disciplinary proceeding owed a fiduciary duty to the investors as a partner).

*Id.* at 1063.

■ Knowing conversion requires proof of three elements: (1) the taking of property entrusted to the lawyer, (2) knowledge that the property belongs to another and (3) knowledge that the taking is not authorized. All three elements must be established as of the time of the taking. At the time Katz wrote the checks at issue in this case he knew that the funds in the joint account had been entrusted to both him and to SLC as a result of the settlement. He also knew that the dispute between himself and Salmon, combined with his agreement that the funds would be deposited in the joint account and not disbursed until their dispute was resolved, deprived him of any authority to unilaterally withdraw funds.[10]

Finally, Katz knew that the amount he withdrew far exceeded the maximum amount

9. Although Katz clearly formed the intent to permanently deprive SLC and Salmon of the funds in order to "level the playing field," whether he believed he was permanently depriving the third parties who asserted a claim to the funds is irrelevant for a knowing misappropriation analysis under Colo. RPC 8.4(c).

10. The dispute between Katz and Salmon attached to *all* funds remaining from the Groves settlement after all third parties were paid. Even if there had been no express agreement by Katz that he would not withdraw any funds from the joint account, the applicability of Colo. RPC 1.15(c) would have deprived Katz of any authority to unilaterally withdraw funds from that account so long as the dispute continued.

to which he would have been entitled under the terms of the co-counsel arrangement on the Groves matter. Although Katz may have harbored an expectation that some portion of those funds might belong to him at some point in the future, at the time he wrote the checks, he knew that entitlement to the funds was disputed and the funds in the account did not, as yet, belong to him. Consequently, Katz's conduct satisfies all three elements of the *Varallo* test for knowing conversion and therefore constitutes a violation of Colo. RPC 8.4(c). *See People v. Lavenhar*, 934 P.2d 1355, 1359 (Colo.1997) (holding that a lawyer's knowing misappropriation of funds, whether belonging to a client or third party, warrants disbarment except in the presence of extraordinary factors of mitigation); *In the Matter of Thompson*, 991 P.2d 820 (Colo.1999)(lawyer misappropriated funds from firm in which he was a salaried employee); *People v. Nulan*, 820 P.2d 1117 (Colo.1991)(finding conversion even though escrowed funds held by the lawyer were the property of parties who were not clients of the lawyer). Other jurisdictions make no distinction between client funds and funds belonging to partners or third parties. *See Committee on Professional Ethics v. Piazza*, 405 N.W.2d 820, 821–822 (Iowa 1987)(attorney disbarred for converting or misappropriating over $10,000 of partnership funds to his own use without the knowledge or authority of his law partners, despite his arguments that he was entitled to the funds which he obtained and he did not intend to maliciously hide anything from his partners). Katz's conduct violated Colo. RPC 8.4(c) as set forth in claim four.

### Claim Five: Colo. RPC 8.4(a)

### (Attempt to Violate the Rules of Professional Conduct)

 Colo. RPC 8.4(a) provides in relevant part that "[i]t is professional misconduct for a lawyer to violate or attempt to violate the rules of professional conduct." For the same reasons set forth above, Katz's issuance of the checks to pay his personal income tax

obligations in the amount of $56,500, was an attempt, known to be without authority, to exercise dominion and control over funds entrusted to him which he knew belonged to another. The fortuitous discovery and frustration of his intended misappropriation of those funds does not lessen the seriousness of his actions. Through his conduct, Katz attempted to knowingly convert funds of another in violation of Colo. RPC 8.4(a).

### III. SANCTIONS/IMPOSITION OF DISCIPLINE

 In Colorado, the presumptive sanction for knowing conversion of the property of another is disbarment. *Varallo*, 913 P.2d at 11; *People v. Rishel*, 50 P.3d 938, 944 (Colo. PDJ 2002); *People v. Wiedman*, 36 P.3d 785, 788 (Colo.1999)(holding that a lawyer's knowing misappropriation of funds, whether belonging to a client or a third party, warrants disbarment except in the presence of extraordinary factors in mitigation). *See also Siegel*, 133 N.J. at 170, 627 A.2d 156 (holding that knowingly misappropriating funds—whether from a client or from one's partners—will generally result in disbarment, acknowledging that although the relationship between lawyers and clients differs from that between partners, misappropriation from the latter is as wrong as from the former). The additional rule violations of Colo. RPC 8.4(c) based on deceit, dishonesty and fraud, as well as the established violations of Colo. RPC 8.4(a), Colo. RPC 1.15(a) and Colo. RPC 1.15(c) reinforce the conclusion that disbarment is the presumptive sanction.

The ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") is the guiding authority for selecting the appropriate sanction to impose for lawyer misconduct. Pursuant to ABA *Standard* 5.11(b), disbarment is generally appropriate when a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice. ABA *Standard* 4.11 provides that

disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client. Pursuant to ABA *Standard* 7.1, "disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public or the legal profession."

Colorado has followed the ABA *Standards* by imposing disbarment for knowing conversion of the funds belonging to third parties. "[A] lawyer's knowing misappropriation of funds, whether belonging to a client or third party, warrants disbarment except in the presence of extraordinary factors in mitigation." *See In re Thompson*, 991 P.2d 820 (Colo.1999)(disbarring attorney for misappropriating $15,000 in funds that clients gave to him so that he could turn them over to his law firm); *People v. McDowell*, 942 P.2d 486, 492 (Colo.1997); *People v. Motsenbocker*, 926 P.2d 576, 577 (Colo.1996)(lawyer disbarred for knowingly misappropriating bar association funds); *People v. Guyerson*, 898 P.2d 1062 (Colo.1995)(attorney stipulating to disbarment for having improperly billed his law firm and received $13,500 in falsified requests for advances for travel and expenses that did not occur which were billed to four or five of the firm's clients); *People v. Anderson*, 2000 Colo. Discipl. LEXIS 3 (Colo. PDJ July 2000)(attorney disbarred for, among other rule violations, taking three checks from his law firm trust account checkbook without the law firm's knowledge or authority and using one of them to withdraw $3,400 from the trust account for his own use).

In determining the appropriate sanction, the Hearing Board must consider factors in aggravation pursuant to ABA *Standard* 9.22 and factors in mitigation pursuant to ABA *Standards* 9.32. In the present case, several factors recognized by the ABA *Standards* as

aggravating factors are applicable. Katz harbored a dishonest or selfish motive, *see id.* at 9.22(b); he committed multiple offenses, *see id.* at 9.22(d); Katz refused to acknowledge the wrongful nature of his conduct, *see id.* at 9.22(g); and he had substantial experience in the practice of law, *see id.* at 9.22(i). Finally, the evidence did not establish that Katz acknowledged the wrongful nature of his actions, *see id.* 9.22(g). Katz is regretful only that his actions resulted in the disciplinary proceeding against him.

In mitigation, in thirty-two years of practice, Katz has had no prior discipline, a factor which may be considered pursuant to ABA *Standards* 9.32(a). He made restitution to rectify the consequences of his misconduct, *see id.* at 9.32(d);[11] he had personal or emotional problems, *see id.* at 9.32(c); and he made free and full disclosure in the course of these proceedings, *see id.* 9.32(e). Katz did not show or express genuine remorse for his actions, and accordingly, remorse is not considered as a factor in mitigation in this case.

Katz also raised as a factor in mitigation his own mental disability at the time of the conduct involved in this case. Pursuant to ABA *Standards* 9.32(i)(Supp.1992) a mental disability may be considered as a factor in mitigation when: (1) there is medical evidence that the respondent is affected by a mental disability; (2) the mental disability caused the misconduct; (3) the respondent's recovery from the mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely. To establish the presence of a mental disability as a factor in mitigation, Katz must satisfy all four elements of ABA *Standard* 9.32(i). *People v. Goldstein*, 887 P.2d 634, 641 (Colo. 1994) *citing People v. Moore*, 849 P.2d 40 (Colo.1993); *People v. Post*, 2000 Colo. Discipl. LEXIS 80 * (Colo. PDJ May 15, 2000)(disbarring attorney for knowing con-

---

11. This mitigating factor is given little weight because the return of funds was not immediate and was coordinated with a resolution of his dispute with Salmon concerning the Groves settlement funds.

version among other rule violations where, although it was established that attorney suffered from mild to moderate depression, post-concussive syndrome, and an affective disorder, no evidence was presented to establish that the mental disability caused the misconduct and therefore the attorney's mental condition was not considered as a mitigating factor). *Cf. In the Matter of a Suspended Member of the State Bar of Arizona, Victor Wallis Riches,* 179 Ariz. 212, 877 P.2d 785, 786, 788 (1994)(attorney stipulated to a three year suspension for his conduct in which, over a five year period, he retained sums for himself which belonged to the law firm in which he was a shareholder, where it was established that the misconduct was caused by the attorney's bipolar disorder and holding that were it not for the record establishing the diagnosis of bipolar manic depressive psychosis, the appropriate sanction would be disbarment).

In *People v. Lujan,* 890 P.2d 109 (Colo. 1995) the Colorado Supreme Court analyzed the degree of mitigation necessary to reduce the presumptive sanction of disbarment in knowing conversion cases. Recognizing that disbarment is almost invariably the appropriate sanction for knowing conversion, the Supreme Court cited with approval the analysis of ABA *Standard* 9.32(i) presented to them by the Hearing Board. The attorney in *Lujan* had been involved in a serious head-on automobile collision while on vacation in Egypt, suffered a closed head injury, and was sexually assaulted while injured at the accident site. After her physical injuries were sufficiently healed to allow her return to work as an attorney, she began to engage in extensive shopping sprees using the firm's credit card. When challenged on the expenses, she attempted to conceal her personal use of the card. Medical testimony established that the incident in Egypt had caused her to develop both major depression and an obsessive-compulsive disorder which she could not control without medication. The *Lujan* court characterizes the degree of mitigation as "extraordinary and tragic," and concludes:

[T]he respondent's obsessive compulsive disorder caused the misconduct by manifesting itself as an overwhelming compulsion to shop following her experiences in Egypt. The board thought it significant that the type of disorder that the respondent suffers from "is a lifetime affliction of biological origin which cannot be controlled without medication." The misconduct was arrested once the respondent's disorder was properly diagnosed and treated with the correct medication.

*Id.* at 112.

Relying upon the Commentary to the ABA *Standard* 9.32(i)(Supp.1992), the Court found that "if the offense is proven to be attributable solely to a disability or chemical dependency, it should be given the greatest weight." *Id.* at 112. Consideration of the reasoning in *Lujan* requires the conclusion that in those cases involving knowing conversion, the degree of mitigation necessary to modify the presumed sanction of disbarment to some lesser sanction is extremely high. It requires demonstration of an uncontrolled mental condition which deprived the offending attorney of the ability to control his or her actions at the time of the conduct in question.

No such evidence was presented in this case. The medical evidence presented described Katz's mental disorder at the time he wrote the checks alternatively as mild depression or acute depression combined with anxiety, neither of which would cause dishonest conduct. Although Dr. Gutterman opined that Katz's mental condition "caused" him to write the checks, that opinion was based upon incomplete information. The weight to be accorded the testimony of an expert is within the sound discretion of the trier of fact. *See People v. Hampton,* 746 P.2d 947, 952 (Colo.1987)(stating that any flaws present in the expert testimony go to the weight to be given the evidence rather that its admissibility); *In re Marriage of Antuna,* 8 P.3d 589, 593 (Colo.App.2000)(stating that the weight to be accorded to the valuation techniques of an expert is for the

trial court's determination); *Hudson v. Park Development Co.*, 493 P.2d 379, 381 (Colo.App.1972)(stating that the weight to be accorded expert testimony is within the sound discretion of the trier of fact). Neither the opinions of the expert nor other extrinsic evidence presented suggest that Katz's mental condition deprived him of the ability to control his actions or was the sole cause of his misconduct. Indeed, the extrinsic evidence—including Katz bragging about his actions to his former paralegal—and his own characterization of finding "legal loopholes" strongly suggest that Katz was able to control his conduct and simply chose not to do so. The evidence presented does not establish that Katz's actions were solely caused by his mental condition and therefore, little weight is given to the mental condition mitigating factor under ABA *Standard* 9.32(i)(Supp.1992).

In a similar analysis, in the *Greenberg* case, *supra,* the New Jersey Supreme Court disbarred the respondent attorney for fraudulently requesting expense checks from his law firm, which he then deposited in a corporate account he had created, and converted the funds to his own use. The respondent attorney demonstrated mental illness and depression, asserting that he should be suspended but not disbarred. The court stated:

> [W]e have been unconvinced that attorneys suffering from identifiable compulsive disorders, mental illness, or mental conditions could demonstrate "a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful." (citations omitted). In those cases we have ... determined that the "medical facts" presented did not provide a sufficient basis for "a legal excuse or justification" in mitigation of the respondent's acts of misappropriation.

*Id.* at 249.

■■■ Attorney disciplinary proceedings are intended to protect the public. ABA *Standard* 1.1. An attorney's use of funds to which a third party whether the client, an-

other attorney or a lien holder—claims an interest, strikes at the heart of the fiduciary duties the attorney must hold paramount. *See Attorney Grievance Comm'n of Maryland v. Nothstein,* 300 Md. 667, 687, 480 A.2d 807 (1984)(disbarring attorney for submitting $40,000 of false expense claims to his law firm); *In re Salinger,* 88 A.D.2d 133, 452 N.Y.S.2d 623, 625 (1982)(disbarring lawyer for misappropriating $8,800 in client payments from his firm over an eleven month period and holding that "any attorney who converts funds entrusted to his custody is, presumptively, unfit to be a member of the Bar").

The present mitigating factors do not rise to the level necessary to deviate from the presumed sanction of disbarment. Accordingly, disbarment is the warranted sanction in the within matter.

## IV. ORDER

It is therefore ORDERED:

1. JERROLD R. KATZ, attorney registration number 13966, is disbarred from the practice of law effective thirty-one days from the date of this Order, and his name shall be stricken from the roll of attorneys licensed to practice law in the State of Colorado.

2. Katz is ORDERED to pay the costs of these proceedings; complainant shall submit a Statement of Costs within fifteen (15) days of the date of this Order, and respondent may file a response within five (5) days thereafter.